(69 P.3d 194)
87,736

BRUCE D. GRAHAM, M.D., P.A., *Appellee,* v. WILLIAM CIROCCO, M.D., *Appellant.*

Opinion filed May 9, 2003.

*Timothy J. Sear,* and *Kevin J. Breer,* of Polsinelli Shalton & Welte, P.C., of Overland Park, for appellant.

*Joseph W. Booth* and *Ronald W. Nelson*, of Rose, Nelson & Booth, of Overland Park, for appellee.

Before BEIER, P.J., ELLIOTT and GREEN, JJ.

BEIER, J: Defendant William Cirocco, M.D., appeals the district court's permanent injunction enforcing a noncompetition covenant of his employment contract with plaintiff Bruce D. Graham, M.D., P.A.

Bruce Graham, a colorectal surgeon, has practiced in the Kansas City area since 1987, doing business as Bruce D. Graham, M.D., P.A.. In 1994, finding he had more work than he could do, Graham recruited Cirocco to join his practice. Cirocco moved from New York to do so. There were then six colorectal surgeons in the metropolitan Kansas City area, including the parties; four had offices on the Missouri side of the border, and Graham and Cirocco had their office on the Kansas side.

The parties entered into an employment contract on July 1, 1994, and each year thereafter until Cirocco left Graham's practice. The last of these contracts, which is the one at issue here, read in pertinent part:

"XVII. Noncompetition Agreement

. . . .

"(B) . . . (ii) For a period of two (2) years after leaving the employment of [Graham] and within the geographic area measured by a radius of one hundred fifty (150) miles from each of the offices of [Graham], [Cirocco] agrees that he will not solicit business from the patients or referral sources of [Graham] with whom he came in contact as an employee of [Graham]. Upon the termination of this Agreement or upon the termination of [Cirocco's] employment with [Graham], [Graham] shall mail or distribute an announcement, advising patients currently being treated by [Cirocco] that [Cirocco] is no longer employed by [Graham] and that upon written request to [Graham] by a patient or patients, copies of the patient's records will be released to the patient. No such announcement shall be mailed or distributed by [Cirocco]. The announcement shall be sent by [Graham] within ten (10) days after [Cirocco] advises [Graham] of his new office address, but in no event shall the announcement be sent sooner than fifteen (15) days before the effective termination date of this Agreement nor later than thirty (30) days after the effective date of such termination.

"(C) [Cirocco] further agrees that for a period of two (2) years after leaving the employment of [Graham], [Cirocco] will not open an office within twenty-five

(25) miles of the hospitals listed in the recitals of this Agreement or provide services at said hospitals.

. . . .

"(K) Notwithstanding the terms of this Noncompetition Agreement, [Cirocco] shall be allowed, without violating the terms [of this] Agreement, to accept patients, whether they are former or present patients of [Graham], that request, in writing, the services of [Cirocco]."

The hospitals listed in the agreement were: Baptist Medical Center, Shawnee Mission Medical Center, Menorah Medical Park, Research Medical Center, Park Lane Medical Center, Saint Luke's South, Research Belton Hospital, North Kansas City Hospital, Olathe Medical Center, St. Joseph Health Center, Overland Park Regional Medical Center, and Providence Medical Center. This meant that Cirocco was prohibited from providing services at hospitals or opening an office within the geographic area bounded by Lawrence on the west; Blue Springs, Missouri, on the east; Leavenworth on the north; and a line 25 miles beyond Olathe on the south.

Cirocco tendered his resignation on May 24, 2000, but continued to work for Graham until June 30, 2000. Cirocco opened his own new office for the practice of colorectal surgery next door to Graham 3 days later; this location was within 25 miles of the listed hospitals. The district court also heard evidence that Cirocco began soliciting patients and referral sources of Graham's shortly before he left their joint practice.

Despite Cirocco's tactics, Graham's schedule remained full. The record on appeal demonstrates that some patients had to wait 3 to 4 weeks for an appointment. Moreover, Graham had to remain on call 24 hours a day, 7 days a week, and he was again considering adding another surgeon to his practice to help with the workload.

Graham sued to enjoin Cirocco, alleging Cirocco had breached the noncompetition covenant by opening an office within 25 miles of the prohibited hospitals and by soliciting patients. In response, Cirocco argued that the covenant was unenforceable as against public policy because it suppressed ordinary competition by protecting interests in patient and referral contacts and would leave northeast Kansas with a shortage of colorectal surgeons.

At trial, Cirocco presented testimony of Dr. John Heryer, a former colorectal surgeon and current Vice-President and Medical Director of Blue Cross and Blue Shield of Kansas City. Heryer testified northeast Kansas would be underserved if it had only one colorectal surgeon. In his view, such a surgeon could not serve Menorah Medical Center, Olathe Medical Center, Overland Park Regional Medical Center, Shawnee Mission Regional Medical Center, and KU Medical Center adequately. The district court also heard testimony that patients requiring colorectal surgery whose surgeries were performed by general surgeons rather than members of the colorectal subspecialty have higher death rates than patients treated by colorectal surgeons.

The district court concluded Graham had protectable interests in his patient base and contacts with referring physicians. Although the judge expressed concern at trial about the covenant's geographic breadth, he ultimately ruled that the covenant was reasonable in scope and duration and should be enforced in its entirety. The court granted a permanent injunction for 2 years, beginning March 1, 2001, pursuant to the duration term of the agreement.

Our Supreme Court has evaluated noncompetition agreements between physicians only three times. See *Weber v. Tillman*, 259 Kan. 457, 913 P.2d 84 (1996) (involving dermatologist); *Ferraro v. Fink*, 191 Kan. 53, 379 P.2d 266 (1963) (involving pathologist); *Foltz v. Struxness*, 168 Kan. 714, 215 P.2d 133 (1950) (involving physician/surgeon). One of those cases, *Ferraro*, dealt only with the district court's handling of the issue of adequate consideration, something not contested on this appeal. The two other cases dealt with enforceability questions of the type before us. In each, the Supreme Court upheld the covenant, although the geographic term of the *Foltz* covenant had been modified previously by the district court. See *Weber*, 259 Kan. at 475; *Foltz*, 168 Kan. at 722.

In *Weber*, the justices stated:

"A noncompetition covenant ancillary to an employment contract is valid and enforceable if the restraint is reasonable under the circumstances and not adverse to the public welfare. [Citations omitted.] The rationale for enforcing a noncompetition covenant is based on the freedom of contract. [Citation omitted.] However, it is well settled that only a legitimate business interest may be protected by

a noncompetition covenant. If the sole purpose is to avoid ordinary competition, it is unreasonable and unenforceable. [Citations omitted.] Additionally, noncompetition covenants included in employment contracts are strictly construed against the employer. [Citations omitted.]" 259 Kan. at 462.

In *Foltz*, the Supreme Court noted that the purpose and intent of such a covenant was to protect encroachment on the professional business the plaintiff employer had devoted a life to building. 168 Kan. at 721. Concerning the covenant's intersection with public policy, the court stated:

"The instant contract is not violative of any positive statute or well-established rule of law. It is the duty of courts to sustain the legality of contracts in whole or in part when fairly entered into, if reasonably possible to do so, rather than to seek loopholes and technical legal grounds for defeating their intended purpose. It also has been said, and we think rightly, the paramount public policy is that freedom to contract is not to be interfered with lightly. [Citation omitted.]" 168 Kan. at 721-22.

The outcome of the *Foltz* case was influenced by the district court's findings that the city in which the parties practiced had an adequate number of physicians and that it was no more in need of additional physicians and surgeons than many similar communities. The district court also had found there was no attempt at a monopoly by the plaintiff employer. These findings left no room to disturb the district court's conclusion that no public policy or public interest was affected by the restriction on the former employee's practice. 168 Kan. at 722.

In *Weber*, the court pointed out that several jurisdictions had discussed the criteria to be evaluated on the enforceability of noncompetition covenants between physicians. See 259 Kan. at 464. The *Weber* court then directed us to consider four factors:

"(1) Does the covenant protect a legitimate business interest of the employer? (2) Does the covenant create an undue burden on the employee? (3) Is the covenant injurious to the public welfare? (4) Are the time and territorial limitations contained in the covenant reasonable? The determination of reasonableness is made on the particular facts and circumstances of each case." 259 Kan. at 464.

In this case, the district court judge concluded the noncompetition covenant was reasonable, enforceable, and not against public policy, but he did not specifically evaluate each of these four factors

in his journal entry. When a district court has made factual determinations, this court must allow those determinations to stand if they are supported by substantial competent evidence. If a district judge fails to make factual findings, this court must presume the trial court found all facts necessary to support its judgment when there is no objection to insufficient findings of fact and conclusions of law. *Weber*, 259 Kan. at 464 (citing *Galindo v. City of Coffeyville*, 256 Kan. 455, 467, 885 P.2d 1246 [1994]). However, the ultimate question of whether a restrictive covenant is contrary to public policy is a question of law over which this court exercises unlimited review. 259 Kan. at 462. Although the four factors enumerated in *Weber* overlap in certain material respects, we examine each in turn.

### Legitimate Business Interest

The district court did not specifically address this factor in its decision.

Cirocco argues on appeal that Graham could not have had a protectable interest in either his patients or his referral sources because the covenant did not absolutely prevent Cirocco from seeing such patients or from receiving referrals from such sources. Rather, he could see such patients and accept such referrals as long as he did not first solicit them within 150 miles of Graham's office.

Cirocco's reasoning on this point is fallacious. Graham need not have sought to prohibit *all* of Cirocco's contacts with patients and referral sources from their earlier joint practice in order to prove he had a right to lawfully restrict *some* of them. The covenant's attempt to prevent predatory behavior at or near the time of Cirocco's exit from Graham's practice while permitting patients and referring doctors to continue to exercise their own choices struck an acceptable balance among the interests of the two parties, the patients, and the referring doctors. It also preserved the efficient and effective operation of the overall health care delivery system. See *Eastern Distributing Co., Inc., v. Flynn*, 222 Kan. 666, 671, 567 P.2d 1371 (1977) ("customer contacts" legitimate protectable

interests of employers); see also *Weber*, 259 Kan. at 467 (recognizing other jurisdictions have held referral sources protectable).

Cirocco also argues that Graham failed to demonstrate that a colorectal surgeon enjoys a "near-permanent" relationship with his or her patients, in the same sense that a family practitioner or internist might. See *Weber*, 259 Kan. at 467 (citing *Retina Services, Ltd. v. Garoon*, 182 Ill. App. 3d 851, 855, 538 N.E.2d 651 [1989]). We agree that a patient's relationship with a colorectal surgeon — indeed, with a surgeon of almost any stripe — is likely to be more short-term. However, barring patient dissatisfaction with the surgeon's technical performance or bedside manner, it is quite likely to persist as long as the patient continues to require surgical care and follow-up.

Cirocco also focuses on whether Cirocco would have come into contact with Graham's patients and referral sources absent the employment relationship. Although the record reflects that Graham was extremely busy when Cirocco arrived, suggesting Cirocco might have set up shop by himself and developed a successful practice, the fact is he did not. Instead, he came to an entirely new area of the country, became board-certified while working for Graham, and, for 6 years took advantage of Graham's established contacts in the community to make a name for himself. See *Weber*, 259 Kan. at 468 (citing *Canfield v. Spear*, 44 Ill. 2d 49, 51, 254 N.E.2d 433 (1969); *Retina Service*, 182 Ill. App. 3d at 858; *Fields Foundation, Ltd. v. Christensen*, 103 Wis. 2d 465, 480, 309 N.E.2d 125 [Ct. App. 1981]). Although Cirocco might have ended up with some of the same patients and referral sources to which Graham introduced him to if he had entered the market and practiced on his own, that eventuality is by no means certain. We are comfortable that the district court implicitly resolved this issue correctly.

"The reasonableness of the time and territory restrictions is also part of the factor [in] evaluating the legitimate business interests of the employer. The restrictions must be no greater than necessary to protect the employer's interests." *Weber*, 259 Kan. at 466.

We are not bothered by this covenant's 2-year restriction. Such a time period is common in Kansas noncompetition clause cases;

see, *e.g.*, 259 Kan. at 468-69. However, one of the geographic terms of the covenant is troubling.

The evidence was undisputed that enforcement of the prohibition on Cirocco's placement of an office within 25 miles of the listed hospitals and its prevention of any practice at those hospitals effectively froze him out of metropolitan Kansas City. This is overbroad. Especially given the population density in that area and the fact the covenant would reestablish Graham's monopoly on the Kansas side of the state line, we conclude this aspect of the covenant goes beyond what is permissible and attempts to protect Graham from "ordinary competition of the kind a stranger could give." See 259 Kan. at 467.

### Undue Burden

Cirocco has not argued on appeal that the covenant creates an undue burden on him. Issues not briefed are deemed abandoned. *Bergstrom v. Noah*, 266 Kan. 847, 873, 974 P.2d 531 (1999). We note, however, that this factor would weigh in favor of Cirocco on the 25-mile/no services restriction on hospitals.

### Injury to Public Welfare

Cirocco addresses this factor on appeal by arguing that enforcement of the covenant threatens the health of northeast Kansans. He points to the testimony of Heryer that the covenant's restrictions leave the area with one colorectal surgeon for 700,000 potential patients, a ratio Heryer characterized as dangerous. Cirocco also emphasizes that Graham originally recruited him because there was a need for an additional colorectal surgeon to handle the workload. It is also persuasive on this point that, since Cirocco left Graham's employ, Graham is again overbusy and considering bringing on another physician. Seriously ill patients are faced with long waits for appointments.

Again, the district judge did not specifically address this factor, concluding generally that enforcement of the noncompetition covenant was not against public policy. He did recognize that Heryer had expressed concern over Graham's ability to handle all of the patients who needed help, but he discounted the testimony be-

cause he had not heard what ratio of surgeons to potential patients would be adequate. Cirocco's argument that he bore no burden to establish such a ratio is correct. It was enough that he demonstrated one doctor was not enough. Two necessarily would be better than one, even if not optimal.

The *Weber* decision summarizes several cases from other jurisdictions in which courts refused to enforce noncompetition covenants because they would result in shortages of physicians in medically necessary specialties. 259 Kan. at 470-73. Unlike the dermatologists involved in *Weber*, colorectal surgeons such as Graham and Cirocco are engaged in a medically necessary subspecialty. Limitation of their number in populous areas threatens the public's welfare.

### Time and Territorial Limitations

These limitations have, for the most part, previously been discussed. A 2-year time limitation is acceptable. The 150-mile restriction on solicitation also is acceptable, because it does not operate as a complete ban on treatment of patients or acceptance of referrals when Cirocco has done nothing to prey upon his former employer. The 25-mile limitation on office placement and the prohibition of practice in the entire metropolitan area exceed reasonable scope.

### Relief

The Kansas Supreme Court has previously upheld a district court's equitable modification of a noncompetition covenant governing the conduct of physicians. See *Foltz*, 168 Kan. at 718-19 (district court reduced territorial limitation from 100 miles to 5 miles). On appeal, we are empowered to affirm, reverse, or modify a district court's decision as justice requires. See K.S.A. 60-2101.

Considering the entire appellate record and the four controlling factors discussed above, we hold that the noncompetition covenant in this case should be modified to eliminate the 25-mile restriction on placement of Cirocco's office, as well as the prohibition on Cirocco's delivery of services at any listed hospital located in Kansas.

*Mootness*

One might argue that this case has become moot because of the passage of time. We disagree. Although this particular dispute may have outlived the 2-year period ordered by the district judge, the general situation qualifies as " 'capable of repetition, yet evading review.' " *In re Habeas Corpus Application of Horst,* 270 Kan. 510, 520, 14 P.3d 1162 (2000). We have therefore examined the merits and made a ruling.

Affirmed in part, reversed in part, and remanded for entry of a permanent injunction consistent with this opinion.