(185 P.3d 946)

No. 97,495

WICHITA CLINIC, P.A., *Appellant*, v. MICHELLE M. LOUIS, D.O., *Appellee*.

Opinion filed June 13, 2008.

*Gary L. Ayers* and *Holly A. Dyer*, of Foulston Siefkin LLP, of Wichita, for appellant.

*Gary M. Austerman* and *Christopher A. McElgunn*, of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, for appellee.

Before HILL, P.J., GREEN and STANDRIDGE, JJ.

GREEN, J.: Wichita Clinic, P.A., (the Clinic) appeals from a judgment of the trial court holding that its restrictive covenant in an employment agreement was unreasonable and unenforceable. Applying the factors in determining whether to enforce a restrictive

covenant not to compete, we determine that the covenant should have been enforced. In addition, the Clinic appeals the trial court's ruling that it breached the employment agreement and that the breach precluded its claim for specific performance against Michelle M. Louis, D.O. We determine that although the Clinic breached the employment agreement, the breach did not preclude the Clinic's claim for specific performance. Accordingly, we reverse and remand for entry of judgment consistent with this opinion.

On July 10, 1991, the Clinic and Dr. Louis entered into an employment agreement (the agreement). Dr. Louis was hired with a 2-year guaranteed salary of $80,000 annually, a $5,000 signing bonus, and additional compensation for student loan payments. The agreement set forth compensation, benefits, and division of expenses. Finally, the agreement contained a restrictive covenant. The agreement was drafted by the Clinic.

Dr. Louis terminated her employment with the Clinic at the end of August or September 2004 and began working with Lakepoint Family Physicians in September 2004. On December 28, 2004, the Clinic filed a petition for breach of the agreement because Dr. Louis had continued to practice in Sedgwick County and had failed to pay liquidated damages in violation of the restrictive covenant. The Clinic asked for specific performance of the agreement, an accounting of all of Dr. Louis' earnings, and consequential damages.

In her answer and counterclaim, Dr. Louis raised an affirmative defense: that because the agreement was vague and ambiguous, it must be construed against the Clinic. She also claimed that the restrictive covenant was unreasonable in scope and duration, created an undue burden, did not protect a legitimate business interest, and was contrary to public policy. She also argued that the Clinic was not entitled to damages and was barred by estoppel and waiver. In her counterclaim, Dr. Louis argued that the Clinic had breached the agreement by unilaterally modifying the agreement in 2003 and assessing the costs of physician assistants and other health care assistants to her. She alleged that she did not agree to the modification.

In its answer, the Clinic asserted that Dr. Louis' counterclaim was barred by accord and satisfaction, payment, estoppel and waiver, and failure to state a claim upon which relief could be granted.

On March 29, 2006, Dr. Louis moved for summary judgment. She argued that the agreement did not define "earnings" in the liquidated damages formula and asserted that the reasonable interpretation was gross pay or salary. Dr. Louis maintained that expanding the scope of meaning of "earnings" created an unenforceable penalty. Moreover, Dr. Louis asserted the noncompete provision was invalid because it only sought to prohibit ordinary competition and did not protect a legitimate business interest.

The Clinic moved for summary judgment on Dr. Louis' counterclaim and asserted "earnings" meant all earnings Dr. Louis collected after termination. Moreover, the Clinic argued that assessing liquidated damages based on all of Dr. Louis' earnings did not create an unenforceable penalty. The Clinic further asserted that the restrictive covenant protected its legitimate business interest in its patient referral system. Finally, the Clinic asserted that Dr. Louis' counterclaim failed because there was no breach of the contract under the plain language of the agreement.

Dr. Louis replied to the Clinic's summary judgment motion and raised essentially the same issues as in her summary judgment motion. She also objected to the Clinic's motion because she was not allowed 21 days to reply.

The trial court denied both the Clinic's summary judgment motion on Dr. Louis' counterclaim and Dr. Louis' summary judgment motion because the definition of "earnings" in the restrictive covenant could not be determined on the uncontroverted facts in the motions.

Before trial, Dr. Louis filed a motion in limine to prohibit introduction of parol evidence concerning the definition of "earnings" and to limit evidence concerning the parties' course of conduct to their interactions with each other. The court granted the motion in part and denied the motion in part.

During the bench trial, Dr. Louis moved for a directed verdict, arguing that the Clinic did not present evidence of the parties'

intent when the agreement was signed. The court denied the motion and found there was some evidence showing that Dr. Louis had an appreciation of the meaning of the restrictive covenant. After Dr. Louis rested, the Clinic moved for a directed verdict on Dr. Louis' breach of contract claim and asserted that Dr. Louis had failed to show that she had sustained damages because of the breach. The court denied the motion with respect to the breach. Moreover, the court determined that Dr. Louis had demonstrated changes in the overhead calculations in the way the supporting staff and other expenses were handled by the Clinic.

At the conclusion of the trial, the court denied the Clinic's request for specific performance and for an accounting of Dr. Louis' post-termination earnings. The court also held that Dr. Louis was estopped from claiming that the Clinic had breached the agreement. In short, the court made seven specific findings: (1) that the agreement must be strictly construed against the Clinic; (2) that the restrictive covenant was not injurious to the public welfare; (3) that the territorial restriction was reasonable; (4) that the covenant did not protect a legitimate business interest; (5) that the covenant's time restriction created an undue burden and was unreasonable; (6) that because the liquidated damages provision in the covenant was intended to prevent ordinary competition, it was unreasonable and unenforceable; and (7) that although the Clinic breached the agreement, Dr. Louis did not prove actual damages.

*Did the Trial Court Err in Finding the Restrictive Covenant Was Unenforceable?*

The Clinic argues that the trial court erroneously determined that the employment agreement, including the restrictive covenant, was unreasonable and unenforceable. The Clinic asserts that Kansas has long recognized the validity of restrictive covenants in the physician practice context. See *Idbeis v. Wichita Surgical Specialists, P.A.*, 279 Kan. 755, 775, 112 P.3d 81 (2005); *Weber v. Tillman*, 259 Kan. 457, 465, 469, 475, 913 P.2d 84 (1996); *Foltz v. Struxness*, 168 Kan. 714, 721, 215 P.2d 133 (1950); *Graham v. Cirocco*, 31 Kan. App. 2d 563, 572, 69 P.3d 194, *rev. denied* 276 Kan. 968 (2003).

Contracts should be presumed legal, and the party challenging the contract has the burden to prove it is illegal. *Kansas Gas & Electric Co. v. Will Investments, Inc.*, 261 Kan. 125, 129, 928 P.2d 73 (1996). Courts have the duty to sustain the legality of a contract in whole or in part when the contract was fairly entered into and it is reasonably possible to do so, rather than seeking loopholes and technical legal grounds for defeating the contract's intended purpose. The paramount public policy is that freedom of contract should not be interfered with lightly. *Idbeis*, 279 Kan. at 770; *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 246 Kan. 450, 462-63, 790 P.2d 404 (1990). Additionally, parties have wide discretion in fixing the terms of employment contracts, and when the contract is not illegal or unreasonable, it should be honored and enforced by the courts. *Weinzirl v. The Wells Group, Inc.*, 234 Kan. 1016, 1019, 677 P.2d 1004 (1984); see also *Augusta Medical Complex, Inc. v. Blue Cross*, 227 Kan. 469, 475, 608 P.2d 890 (1980) (competent parties can contract on their own terms provided the contract is not illegal or contrary to public policy; absent fraud, mistake, or duress, the parties are bound by its terms).

The interpretation and legal effect of a written contract are matters of law over which this court has unlimited review. *Conner v. Occidental Fire & Cas. Co.*, 281 Kan. 875, 881, 135 P.3d 1230 (2006). This court may construe a written contract and determine its legal effect, regardless of the trial court's construction. *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001). Nevertheless, if the trial court has made findings of fact and conclusions of law, this court determines whether the factual findings are supported by substantial competent evidence and whether those findings supported the conclusions of law. This court has unlimited review of the conclusions of law. *LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 (2007). Substantial evidence possesses both relevance and substance, and it provides a substantial basis of fact from which the issues can reasonably be determined. *Evenson Trucking Co. v. Aranda*, 280 Kan. 821, 836, 127 P.3d 292 (2006).

The primary rule of contract interpretation is to ascertain the parties' intent. If the terms of the contract are clear, the parties'

intent should be determined from the language of the contract itself without applying the rules of construction. *Anderson v. Dillard's Inc.*, 283 Kan. 432, 436, 153 P.3d 550 (2007). Moreover, interpretation of contractual provisions should not be reached merely by isolating one particular sentence or provision, but the entire instrument should be construed and considered by its four corners. "The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. [Citation omitted.]" *Johnson County Bank v. Ross*, 28 Kan. App. 2d 8, 10-11, 13 P.3d 351 (2000).

## A. *Necessary Factors for Enforcement of a Restrictive Covenant*

Our Supreme Court recently considered the subject of restrictive covenants in *Idbeis*, 279 Kan. at 762-63. Citing *Weber v. Tillman*, the *Idbeis* court set out four factors to consider in determining whether to enforce a restrictive covenant not to compete:

" '(1) Does the covenant protect a legitimate business interest of the employer? (2) Does the covenant create an undue burden on the employee? (3) Is the covenant injurious to the public welfare? (4) Are the time and territorial limitations contained in the covenant reasonable? The determination of reasonableness is made on the particular facts and circumstances of each case.' [Citation omitted.]" 279 Kan. at 763.

Besides these four factors, a restrictive covenant must be supported by valid consideration. *Puritan-Bennett Corp. v. Richter*, 8 Kan. App. 2d 311, 313, 657 P.2d 589 (1983). Moreover, a restrictive covenant must be ancillary to the contract. *Weber*, 259 Kan. at 462.

Here, there is no dispute that the restrictive covenant in the employment agreement between Dr. Louis and the Clinic was supported by adequate consideration. Dr. Louis, under the written employment agreement, promised to furnish medical services for the Clinic. Moreover, the Clinic promised to pay Dr. Louis a guaranteed salary of $80,000 annually, plus other benefits, for a period of 2 years. "It is a general rule that a promise by one party is a sufficient consideration for a promise or an act of another. It is the promise and not the performance thereof that constitutes the consideration." *Shunga Plaza, Inc. v. American Employers' Ins. Co.*, 204 Kan. 790, 794, 465 P.2d 987 (1970). Moreover, Dr. Louis'

continued employment by the Clinic during a 13-year period constitutes sufficient consideration to support the restrictive covenant.

In addition, the restrictive covenant was ancillary to the employment contract. The Clinic agreed to employ Dr. Louis in exchange for the restrictive covenant. As a result, the restrictive covenant was ancillary to the written contract of employment.

The trial court determined that the territorial limit of Sedgwick County was reasonable and that the provision was not injurious to the public for the following reasons: (1) that there were a number of family practice physicians; (2) that the Clinic would have absorbed Dr. Louis' patients, and (3) that the patients were not prevented from having quality medical care. The trial court, however, determined that the restrictive covenant did not protect a legitimate business interest. In addition, the court determined that the 3-year time restriction was unreasonable because it created an undue burden on Dr. Louis. Finally, the court determined that the liquidated damages provision had no reasonable basis other than to avoid ordinary competition. Consequently, the court determined that the restrictive covenant was unreasonable and unenforceable.

The noncompetition and liquidated damages clause of the restrictive covenant reads as follows:

"Upon termination of this Agreement, DOCTOR agrees that he/she will not, for a period of three (3) years thereafter, directly or indirectly engage in the practice of DOCTOR's profession in Sedgwick County, Kansas. DOCTOR further agrees that if DOCTOR should leave the employment of the CLINIC for any reason and continue the practice of his/her profession in Sedgwick County, Kansas, during said three year period DOCTOR shall pay the CLINIC, as liquidated damages and not as a penalty, 25% of all earnings collected from such practice during such period; provided, however, that CLINIC shall waive any claim for liquidated damages for that part of the earning collected in competition with CLINIC that is not in excess of Ten Thousand Dollars ($10,000) a year (or an amount annually that is equal to fifteen percent (15%) of the gross income paid DOCTOR in the last full year of his/her employment with CLINIC, whichever is more) if the separation from employment occurs after DOCTOR has reached sixty-two years (62) years of age. The parties agree that during said three-year period the CLINIC shall have the right and opportunity to audit or cause to be audited the DOCTOR's books and records at reasonable times and upon reasonable notice. The CLINIC shall pay for the audit by a certified public accountant of the CLINIC's choice; provided, however, that if such audit should uncover a variance in gross earnings

in the DOCTOR's favor of two percent or more, the DOCTOR shall pay the reasonable costs of such audit."

To determine whether this covenant was reasonable and enforceable, we must consider the remaining four requirements for enforcement of a restrictive covenant.

1. *Did the restrictive covenant protect a legitimate business interest of the Clinic?*

The Clinic argues that the restrictive covenant protects its interest in preserving patient contacts, preventing loss of revenue generated by Dr. Louis, preventing unjust enrichment of Dr. Louis after investing in the establishment of her practice, and preventing losses incurred in recruiting a new physician and assisting the physician in establishing a practice.

In *Weber*, our Supreme Court determined that "only a legitimate business interest may be protected by a noncompetition covenant. If the sole purpose is to avoid ordinary competition, it is unreasonable and unenforceable. [Citations omitted.]" 259 Kan. at 462. Our Supreme Court has recognized that an employer has a legitimate business interest to protect in the following areas: customer contacts, special training of employees, trade secrets, confidential business information, loss of clients, goodwill, reputation, referral sources, and preserving contact with clients. 259 Kan. at 467; but see *Allen, Gibb & Houlik v. Ristow*, 32 Kan. App. 2d 1051, 1058, 94 P.3d 724 (2004) (this court determined employees take knowledge and skills acquired on the job with them when they leave, and those skills are not protectable so long as the employee does not take anything that belongs to the employer). Relying on *Axtell Clinic v. Cranston*, No. 56,745, unpublished opinion filed June 20, 1985, slip op. at 10, the Clinic contends that legitimate interests also include encouraging and enforcing employee loyalty. In *Idbeis*, the court determined that referral services were a legitimate business interest and can be protected by a restrictive covenant because relationships developed by an employee during employment belong to the employer, not the employee. 279 Kan. at 768-69; see also *Eastern Distributing Co., Inc. v. Flynn*, 222 Kan. 666, 671, 567 P.2d 1371 (1977) (customer contacts are protectable

business interests); *Caring Hearts Personal Home Services v. Hobley*, 35 Kan. App. 2d 345, 354, 130 P.3d 1215 (2006) (protectable interest in customer contacts and relationships).

The Clinic contends that its patient base was the foundation for the liquidated damages provision and argues that Dr. Louis was more likely to take her patients with her if she continued to work in Sedgwick County because she was a family practice physician. The Clinic asserts that Kansas courts have recognized that more transient patient bases, such as those for colorectal and heart surgeons, were entitled to protection. Consequently, the loss of family practice patients had even a more legitimate business interest than in the previously mentioned specialties. The Clinic also contends that Dr. Louis' continued practice in Sedgwick County created an immediate influence on its revenues and collections due to loss of patients and revenue generated from those patients. Moreover, the Clinic maintains that Dr. Louis had received patients from the referral system and had made referrals to other Clinic doctors. The Clinic alleges that the revenue loss created a burden to pay its overhead—approximately 50% of Dr. Louis' net production went to overhead.

Furthermore, the Clinic contends that it is protecting its investment in establishing Dr. Louis' practice because she benefitted from starting her practice with a large physician group. The Clinic notes that Dr. Louis' use of its goodwill, reputation, and referral system to build her practice and asserts that part of the investment was the initial salary guarantee, signing bonus, student loan payments, patient referrals, and management of administrative matters and overhead. Finally, the Clinic asserts that it had a protectable interest in recouping the costs of recruiting a replacement physician and contends that the signing bonuses and student loan payments were related to the amount of liquidated damages Dr. Louis was required to pay.

The Clinic also maintains that its claims under the restrictive covenant have been upheld in *Wichita Clinic v. Columbia/HCA Healthcare Corp.*, 45 F. Supp. 2d 1164, 1182 (D. Kan. 1999). In that case, the court considered the same restrictive covenant as in this case when Wesley Medical Center (Wesley) hired 13 primary

care physicians from the Clinic in 1996. The court, in upholding the restrictive covenant, stated:

"The doctors understood that under their employment contracts if they left the employment of Wichita Clinic, they could either refrain from practicing in Sedgwick County for three years, or pay 25% of their earnings over three years as liquidated damages (15% in the case of two of the physicians)." 45 F. Supp. 2d at 1182-83.

Wesley agreed to pay the Clinic the liquidated damages of the doctors. 45 F. Supp. 2d at 1182. The court further held that the restrictive covenant was not void against public policy, was limited in geographical scope and duration, and protected the Clinic's investment in establishing the doctors' practices. Specifically, the court stated that "the provisions can be understood as fairly protecting the investment of the Clinic in helping to establish the physician's practice. [Citation omitted.]" 45 F. Supp. 2d at 1203.

Nevertheless, Dr. Louis argues that the Clinic's evidence related only to the alleged effect on the Clinic when physicians leave the Clinic, not when physicians compete against the Clinic. She also asserts that the Clinic did not establish the quantifiable effect of her leaving, but only established the general costs, that is, recruiting and hiring costs, when any physician leaves. Finally, Dr. Louis contends that the restrictive covenant was not intended to protect a business interest, but was intended to prohibit physicians from leaving the Clinic.

During the trial, Frank Cordon, the Clinic's director of finance, testified about the purpose of the restrictive covenant:

"The non-compete was instituted to protect the Wichita Clinic from doctors leaving the organization, staying in our market area or our competitive area and taking a patient base with them that the Wichita Clinic had helped them to establish, and the liquidated damages provision was to compensate the Wichita Clinic for that loss and to help us continue to operate and to offset the overhead that was ongoing after the doctor left."

Moreover, Cordon stated that the liquidated damages provision was to compensate the Clinic for money expended for recruiting a new physician, including signing bonuses and student loan payments, and for overhead expenses including rent, personnel, supplies, and operating expenses.

As for patient referrals, Cordon stated, as a matter of benefitting the Clinic's owners or stockholders, referring patients to Clinic physicians was encouraged. Cordon testified that the Clinic did not have a policy dictating to whom a physician could refer a patient and stated that he was unaware of a policy prohibiting a physician from referring patients to outside physicians. Nevertheless, Cordon stated, as set out in the employee handbook, managed care referrals were to be made to the Clinic physicians; the Patient Care Committee then would determine whether an outside referral was necessary for the patient's care and could authorize such a referral.

In *Weber,* our Supreme Court stated that the noncompetition covenant "was designed to protect [Dr. Weber's] practice and the value of goodwill developed over 17 years. These are recognized protected interests." 259 Kan. at 468; see also *Foltz v. Struxness,* 168 Kan. 714, 721, 215 P.2d 133 (1950) (involving a factually similar situation). Based on the cases previously cited, the Clinic had a legitimate business interest in its referral system, patient base, and goodwill. See *Weber,* 259 Kan. at 467-68; see also *Idbeis,* 279 Kan. at 770 (employer had a legitimate business interest in the referral sources).

## 2. *Was the restrictive covenant reasonably limited in time, place, and activities?*

The Clinic asserts that the 3-year time restriction in the restrictive covenant was reasonable. Moreover, the Clinic contends that the trial court erroneously determined that time restraints longer than 2 years were unreasonable. See *Idbeis,* 279 Kan. at 758, 775 (the court upheld a noncompetition clause prohibiting practice for 2 years and a liquidated damages clause requiring five annual payments for breach of the noncompete clause); *Varney Business Services, Inc. v. Pottroff,* 275 Kan. 20, 23, 59 P.3d 1003 (2002) (the court upheld a provision requiring an employee who left the firm to compensate the firm for those clients the employee provided services for in the subsequent 5 years); *Foltz,* 168 Kan. at 716-17, 721 (the court upheld a noncompetition provision requiring the employee not to practice medicine within 100 miles [reduced to a radius of 5 miles] of the employer for 10 years from the date the

agreement was signed; when the employee terminated, over 8 years remained on the covenant); *Graham,* 31 Kan. App. 2d at 572 (the court upheld a 2-year time limitation); *Wichita Clinic v. Columbia/HCA Health Care Corp.,* 45 F. Supp. 2d 1164, 1182-83, 1203 (1999) (the same covenant as in this case was upheld).

Here, the trial court stated that the 3-year period was unreasonable under *Graham.* The trial court determined that "a two-year period is common in Kansas for non-competition clauses, and that contract [in *Graham*] has a non-competition clause of two years." The court further stated that there was no legitimate business interest in expanding the noncompetition clause into the third year because Dr. Louis was only given a 2-year guaranteed salary.

The Clinic, however, argues that the trial court did not focus on the covenant itself, but again focused on the damages provision. Furthermore, the Clinic asserts that consideration must be given to the time and costs to recruit a new physician and to get the new physician to full productivity. Consequently, the Clinic asserts that the 3-year time restriction is a reasonable amount of time.

Furthermore, the Clinic contends that the trial court misread and misinterpreted the court's statement in *Graham v. Cirocco,* 31 Kan. App. 2d 563, 570, 69 P.3d 194, *rev. denied* 276 Kan. 968 (2003). The Clinic asserts that the *Graham* court did not specifically state that reasonable clauses were only 2 years or less. In *Graham,* this court stated: "We are not bothered by this covenant's 2-year restriction. Such a time period is common in Kansas noncompetition clause cases . . . ." 31 Kan. App. 2d at 570-71. This court further determined that there was a legitimate business interest in the patients, but the geographical limitation was unreasonable. 31 Kan. App. 2d at 569-72.

The trial court, however, misinterpreted the *Graham* court's statement. This court stated that 2 years was common for noncompetition clauses. Nevertheless, this court did not state that a restrictive covenant that ran beyond 2 years would be considered unreasonable. We determine that the 3-year time restriction for the noncompetition provision of the restrictive covenant was reasonable.

In addition, the territorial restriction prohibiting Dr. Louis from practicing in Sedgwick County for 3 years does not seem unreasonable. The protection given by the covenant was only coextensive with the area from which the Clinic drew most of its patients. As a result, the protection extended only to the periphery of the area covered by the Clinic's business. In *Foltz,* for example, the court approved a reduction in a territorial restriction from 100 miles from the city of Hutchinson to a radius of 5 miles from the city. 168 Kan. at 719. Further, in *Weber,* the court upheld a 30-mile radius restriction from a clinic in Hays. 259 Kan. at 465. Finally, in *Eastern Distributing Co., Inc.,* the court approved a reduction in a territorial restriction from a 50-mile radius from the sales territory to four specific counties. 222 Kan. at 677. In short, there is no factual basis for finding that the time and territory restrictions of the restrictive covenant are unreasonable.

3. *Did the restrictive covenant create an undue burden on Dr. Louis?*

The trial court determined that the restrictive covenant unduly burdened Dr. Louis because the 3-year term was too long and most restrictive covenants were only for 2 years. Moreover, the court determined that Louis' 2-year guaranteed salary was the amount of her overhead contribution.

Nevertheless, as we determined in the previous section, the Clinic's restrictive covenant was reasonably limited as to time and place. Moreover, as the Clinic points out, the restrictive covenant did not entirely prevent Dr. Louis from practicing as a family practice physician. For instance, the covenant gave Dr. Louis the option of practicing in the area and paying liquidated damages. Or, she could refrain from practicing in Sedgwick County until the non-competition agreement had expired. *Weber,* 259 Kan. at 465 (doctor could practice dermatology in Hays as soon as the noncompetition agreement expired). The restrictive covenant does not prevent Dr. Louis from practicing medicine anywhere—only in Sedgwick County for 3 years. Based on these facts, we determine that the restrictive covenant did not impose an undue burden on Dr. Louis.

#### 4. *Did the restrictive covenant injure the public?*

The trial court determined that the restrictive covenant did not prevent Dr. Louis' patients from receiving quality medical care because she could not practice in Sedgwick County. As a result, the trial court determined that Dr. Louis' prohibition from practicing in Sedgwick County would not be injurious to the public welfare. Dr. Louis has not cross-appealed and is not complaining concerning this finding. We determine that the trial court's finding is supported by the record. See *Foltz,* 168 Kan. at 722 (enforced a covenant not to compete based upon the trial court's finding " 'that the City of Hutchinson is no more in need of further doctors and surgeons than many other communities' ").

#### 5. *Was the liquidated damages provision contained in the restrictive covenant a penalty?*

The Clinic asserts that the liquidated damages provision was not an unenforceable penalty and argues that the trial court incorrectly relied on two hypothetical situations to determine the reasonableness of the restrictive covenant. The Clinic asserts that the evidence showed that Dr. Louis' net production the first 17 months after leaving the Clinic was similar to her production at the Clinic. Moreover, the Clinic alleges that 25% of Dr. Louis' net production would not cover the amount of overhead lost when Dr. Louis quit. In other words, the Clinic maintains that its actual damages are greater than the liquidated damages and, therefore, the covenant cannot be considered a penalty.

The propriety of a liquidated damages clause is a question of law over which this court has unlimited review. *IPC Retail Properties v. Oriental Gardens, Inc.,* 32 Kan. App. 2d 554, 561, 86 P.3d 543 (2004). Contracting parties can stipulate to a set amount of damages for breach of contract so long as the provision is liquidated damages and not a penalty. 32 Kan. App. 2d at 561; *U.S.D. No. 315 v. DeWerff,* 6 Kan. App. 2d 77, 78, 626 P.2d 1206 (1981). Liquidated damages is a sum to be paid in lieu of performance; a penalty is security for performance. *IPC Retail Properties,* 32 Kan. App. 2d at 561; *U.S.D. No. 315,* 6 Kan. App. 2d at 79.

The party challenging the provision bears the burden to prove the provision is an unenforceable penalty. *IPC Retail Properties,* 32 Kan. App. 2d at 561. In determining whether a liquidated damages provision is a penalty, the court must consider the whole contract, the situation of the parties, and the circumstances surrounding execution of the contract. A liquidated damages provision will be enforced if (1) the amount stipulated is reasonable in view of the value of the subject matter of the contract and of the probable or presumptive loss if a party breaches the contract, and (2) the nature of the transaction is such that actual damages resulting from the breach would not be easily or readily determinable. *White Lakes Shopping Center, Inc. v. Jefferson Standard Life Ins. Co.,* 208 Kan. 121, 126, 490 P.2d 609 (1971); 32 Kan. App. 2d at 561. Nevertheless, the provision will be deemed a penalty if there was no attempt to calculate the amount of actual damages that might be sustained in the event of a breach. If the amount of damages is the same for minor or major breaches or total or partial breaches, it is evident the parties did not attempt to calculate actual damages. *IPC Retail Properties,* 32 Kan. App. 2d at 562. To recover liquidated damages, the amount must have some reasonable relationship to the actual injury caused by the breach; if there is no relationship, the provision is a penalty. 32 Kan. App. 2d at 564.

The Clinic argues that the liquidated damages were related to the expected loss it would incur if Dr. Louis breached the noncompetition provision. Moreover, the Clinic argues that such losses were not amenable to precise calculation because they could vary from physician to physician and could change over time. The Clinic points out that the agreement applies to all Clinic physicians and allows a "fair computation of damages applicable to these various physicians and relieves both parties of the burden of proving or disproving actual damages." The Clinic maintains that it could not predict with absolute certainty Dr. Louis' actual collections or how many Clinic patients or referrals would follow Dr. Louis upon termination.

Furthermore, the Clinic contends that the liquidated damages formula in the restrictive covenant results in less damages than those approved in *Varney Business Services, Inc.* In that case, the

noncompetition clause stated that an employee who left the firm must compensate the firm for fees collected from the *firm's clients* for whom the employee provided services in the next 5 years. 275 Kan. at 23-24. Nevertheless, that provision is different from the covenant in this case, which requires Dr. Louis to pay the Clinic "25% of *all earnings collected* from such practice" over the 3 years after her termination. (Emphasis added.)

In this case, the trial court determined that the liquidated damages formula was "wide open, with no real reasonable basis other than to avoid ordinary competition and, therefore, is unreasonable and unenforceable." The court determined that Dr. Louis did not have the ability to negotiate for a different liquidated damages formula because she was just beginning her first year of practice when she signed with the Clinic. Moreover, the court determined that the Clinic could have reasonably determined its losses and that the liquidated damages did not have a relationship to actual damages.

In determining the liquidated damages had no relationship to actual damages, the trial court considered the following two hypothetical situations:

"This is 25 percent of all earnings collected for the next three years. If Dr. Louis was the lousiest business entrepreneur person in the Sedgwick County medical community and went out and fell flat on her face and filed bankruptcy, the Wichita Clinic would get zip.

"If Dr. Louis was one of the most astute entrepreneurs in Sedgwick County's Medical Society and went out and made a million dollars the next year, the second year or third year, the Clinic is supposed to get 25 percent of that under their theory, which is gross revenues or payments received less contract writedowns before the payment of operating expenses.

"On one hand, it could generate a complete windfall to the Wichita Clinic, which would be a penalty and unconscionable.

"On the other hand, if Dr. Louis went bankrupt, they would get zip. It is an unknown what this liquidated damage clause would generate. And it flies in the face of the Clinic being a long-established, successful, a very reputable group of doctors, and with all these salary computations that they cannot project an overhead expense for a family practitioner; that, yes, Dr. Louis leaving after being there more than three years, paying a portion of the overhead expenses and is replaced with a brand new, two-year guarantee, no contribution to overhead, there is a loss of that contribution to overhead."

Finally, the court determined that requiring payment of 25% of all earnings collected over 3 years had a chilling effect and was designed to prevent ordinary competition.

Yet, as the Clinic points out, the trial court's hypotheticals might be well-founded if there actually had been a punitive windfall. The trial court's hypotheticals, however, literally beg the question, which is the "fallacy of founding a conclusion on a basis that as much needs to be proved as the conclusion itself." Fowler, A Dictionary of Modern English Usage 614 (1950). The trial court's hypotheticals presuppose what they attempt to show: namely, that the liquidated damages had no relationship to the actual damages that the Clinic would have incurred based on Dr. Louis' departure and her competition with the Clinic. The trial court openly assumed that the liquidated damages were punitive based on its two hypotheticals.

Nevertheless, when requirements for a restrictive covenant are met, as we have previously determined, the covenant should be enforced. Citing *Foltz*, 168 Kan. at 721-22, the *Weber* court stated:

" 'The instant contract is not violative of any positive statute or well established rule of law. It is the duty of courts to sustain the legality of contracts in whole or in part when fairly entered into, if reasonably possible to do so, rather than to seek loopholes and technical legal grounds for defeating their intended purpose. It also has been said, and we think rightly, the paramount public policy is that freedom to contract is not to be interfered with lightly. [Citation omitted.]' " *Weber*, 259 Kan. at 463.

During the trial, Cordon testified that other Clinic physicians had left Sedgwick County, rather than stay and pay liquidated damages, after leaving the Clinic. He further testified that revenue from a family practitioner like Dr. Louis was generally divided equally between the physician and the Clinic for overhead expenses. Overhead included the direct expenses of the physician, that is, the physician's staff, personnel, medical supplies, equipment depreciation, rent, maintenance, and receptionist or support staff salaries; and the indirect expenses, such as billing, support staff, maintenance, computer technicians, computer equipment, and telephone service.

Cordon further stated that there was no precise way to predict what a terminated physician was going to do after termination or what the terminated physician's new salary would be. Cordon stated that the amount collected as liquidated damages would vary depending on the physician's earnings. Doctor Robert Kenagy, the Clinic's chief medical officer, stated that the liquidated damages were based on all earnings collected or net collections.

Dr. Louis testified that she completed her residency at the end of June or July 1991 and had planned to work with a group of family physicians, FPPA Family Physicians, P.A. (FPPA). She discovered FPPA had merged with the Clinic in June or July 1991, and she joined the Clinic to remain with FPPA. Dr. Louis testified that she had been furnished with a copy of the agreement and had read it before signing the agreement. Yet, she testified that there had been no negotiation with respect to the terms of the agreement. Dr. Louis further stated that no one with the Clinic explained the terms of the agreement to her. She also testified that she did not speak with an attorney before signing the agreement. She denied receiving a Clinic handbook when she signed the agreement or at any time before 1997 and stated that she did not receive any written information defining the terms of the agreement.

Dr. Louis further testified that she did not know how a liquidated damages provision operated. Dr. Louis admitted that she read the restrictive covenant before signing the agreement, but she did not concern herself about the covenant. She testified that she heard Wesley would have paid her liquidated damages if she wanted to join the 13 other physicians that left the Clinic in 1996, or some amount of money, to relieve her from her contract with the Clinic. She also heard that the Clinic received an amount of money from Wesley after the other physicians had left in 1996.

The Clinic relies heavily on *Varney Business Services, Inc.*, but in that case the provision was tied to clients who followed the terminated employee. 275 Kan. at 23. Other cases have also tied liquidated damages to former patients, clients, or a percentage of the terminated employee's salary before termination. See *Idbeis*, 279 Kan. at 758 (the liquidated damages was five annual payments of 20% of taxable compensation received in the 12-month period im-

mediately before termination); *Weber*, 259 Kan. at 459 (the liquidated damages was payment of an amount equal to the last 6 months' salary from the employer and the bonus).

As stated earlier, the trial court improperly determined that the liquidated damages provision was punitive based on its two hypothetical situations. There was evidence, however, that actual damages would be extremely difficult to calculate. Consequently, use of such a provision would have been justified. The amount of liquidated damages seemed to bear some reasonable relationship to the actual injury caused by the breach. Moreover, the provision seemed to be a reasonable estimate of loss, as agreed to by the parties when contracting, to be enforced whether the later actual loss was more, as demonstrated by the Clinic, or less than the advance estimate. Because the breach would produce damages uncertain in amount and difficult to prove, we cannot say that the provision was inherently arbitrary or unreasonable. As a result, we determine that the liquidated damages provision was not a penalty and will be enforced.

6. *Even if the liquidated damages clause had been a penalty, a remand would have been proper for the determination of actual damages.*

When a liquidated damages clause is determined to be out of proportion to the business to be protected, the agreed damages clause is considered a penalty. *Metz v. Clay,* 101 Kan. 45, 165 Pac. 809 (1917). In *Metz,* the court determined that a bond had to be treated as a penalty and not as liquidated damages. Yet, the *Metz* court held that the plaintiff would still be allowed to maintain an action for actual damages. See *White Lakes Shopping Center, Inc. v. Jefferson Standard Life Ins. Co.,* 208 Kan. 121, 125, 490 P.2d 609 (1971) (citing *Metz*); *IPC Retail Properties v. Oriental Gardens, Inc.,* 32 Kan. App. 2d 554, 565, 86 P.3d 543 (2004). Moreover, the Clinic prayed for actual damages in its petition.

*Did the Trial Court Err in Finding the Clinic's Modification of the Compensation Formula Precluded the Clinic's Claim for Specific Performance?*

The Clinic asserts that the parties freely agreed to the terms of the agreement, which allowed the Clinic to modify the physician compensation formula, and therefore, the Clinic did not breach the employment agreement. Furthermore, the Clinic argues that, even if it breached the agreement, Dr. Louis is estopped from claiming the breach relieved her of specific performance.

Nevertheless, Dr. Louis asserts that the Clinic did not satisfy the "clean hands" doctrine and is not entitled to specific performance. The clean hands doctrine provides that one who seeks equity must do so with clean hands, and the doctrine is applied at the court's discretion. No party can obtain affirmative relief in equity with respect to a transaction in which the party is guilty of inequitable conduct. *T.S.I. Holdings, Inc. v. Jenkins*, 260 Kan. 703, 720, 924 P.2d 1239 (1996).

The trial court held that the Clinic breached paragraph 9, the "Facilities and Expenses" clause, of the agreement, and that breach prevented the Clinic from seeking specific performance. The court stated the restructuring of salary computations and allocations of support personnel, making Dr. Louis liable for those expenses, breached the agreement. Nevertheless, the court determined that Dr. Louis did not sustain her burden to prove actual damages. The court found Dr. Louis "took advantage of the increases and now wants to declare a breach and try to recoup what she claims is some loss." The court determined that Dr. Louis was estopped from asserting a breach and seeking damages because she took advantage of the salary changes.

A. *Did the Clinic breach the employment agreement?*

The Clinic asserts that it did not breach the employment agreement by modifying Dr. Louis' compensation in 2003. The Clinic argues that the plain language of the agreement gave its Board of Directors (Board) the duty to set annual salaries according to guidelines established from time to time. The Clinic maintains that

it had discretion to adjust the salaries under the agreement, the physician handbook, and the salary computation sheets.

Whether a party breached a contract is a question of fact. See *Dutta v. St. Francis Regional Med. Center, Inc.*, 18 Kan. App. 2d 245, 257, 850 P.2d 928 (1993), *aff'd* 254 Kan. 690, 867 P.2d 1057 (1994) (substantial competent evidence supported the jury's verdict of breach of contract). When the trial court makes findings of fact and conclusions of law, this court determines whether the factual findings were supported by substantial competent evidence and whether those findings support the conclusions of law. *LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 (2007).

In this case, paragraph 9 of the employment agreement states:

"The CLINIC shall furnish, or cause to be furnished, all necessary apparatus, instruments, equipment and supplies that it shall deem reasonable and necessary for effectively and successfully conducting the practice of DOCTOR's profession. The CLINIC shall assume all reasonable and necessary expenses incident to the practice of DOCTOR's profession, except the expense of transportation within Sedgwick County, Kansas."

Nevertheless, paragraph 12 of the employment agreement stated: "The CLINIC's Board of Directors' [*sic*] shall fix DOCTOR's annual salary in all subsequent years under this Agreement pursuant to the salary guidelines, either written or unwritten, that it establishes from time to time for application to all doctors similarly situated." Finally, paragraph 21 stated amendments or additions to the agreement must be in writing and signed, unless otherwise provided. The employee handbook also stated:

"The determination of professional compensation is a responsibility of the Board of Directors as described in Paragraph 12 of the Work Agreement. The final determination of compensation is a prerogative of the Board and adjustments may be made at the Board's discretion.

"Any change in the manner of compensation will be discussed at length with the staff and the Board will seek input from shareholders in a formal and/or informal manner before implementing change."

Finally, the salary computation sheets, beginning as early as February 1, 1998, and including the new and old formula calculations starting in March 2003, contained the following statement: "The

determination of Professional staff salaries is the exclusive responsibility of the Board of Directors."

The Clinic asserts that other states found there was no breach of similar contracts when one party had the discretion to adjust another party's compensation under the plain contractual language. See *Frichter v. National Life & Acc. Ins. Co.*, 620 F. Supp. 922, 927 (D.C. La. 1985), *aff'd* 790 F.2d 891 (5th Cir. 1986) (the court dismissed the plaintiff's claims and found the defendant had the right to modify compensation and the procedures to determine compensation); *Donovan v. Bankers Fidelity Life Ins. Co.*, 26 F.3d 854, 855-56 (8th Cir. 1994) (the court upheld summary judgment in favor of the defendant because the contract gave the defendant discretion to determine adjustments to compensation).

In contrast, Dr. Louis testified that the Board wanted to retain the family practitioners who were approached by Wesley and presented the idea of hiring physician assistants. The Board allegedly told Dr. Louis that the Clinic would pay for the physician assistants and the physicians would get the income from the assistants' production.

Cordon testified that before 1996, the Board decided to include the physician assistants' productivity in the physician's productivity without deducting the amount paid to the assistant from the physician's salary. Cordon further testified that a new compensation plan was proposed in February 1996 to create a more competitive salary formula. Cordon stated that the assistants' salaries and benefits would be deducted from the physician's productivity under the new formula, but the physician would receive additional compensation for the assistant's productivity.

Dr. Louis testified that there was no expense to the physician for the direct-help staff under the old plan. She, however, stated that the new plan charged back to the physician the direct help: the physician assistants and their direct-help extenders. Cordon also stated that the new salary formula adopted in 2003 included a direct-help charge back to the physician.

Dr. Louis argued that the new plan violated the employment agreement because the agreement stated expenses and assistants' salaries would be covered by the Clinic. Dr. Louis understood par-

agraph 9 of the employment agreement to mean the Clinic would pay for expenses related to her practice: equipment, personnel, malpractice insurance, medical society dues, pager fees, beepers, and any expense that would come up. Dr. Louis explained that she thought such expenses were covered by her production and then she received a salary. Under the new plan, however, Dr. Louis was directly responsible for her assistants and that money was directly subtracted from her salary. Dr. Louis' salary was less under the new formula than it was under the old formula. Moreover, Dr. Louis testified that she did not agree in writing to amend the employment agreement.

On cross-examination, Dr. Louis admitted that she understood she was under the control of the Clinic and its Board, except for the strictly professional aspects of her services. Dr. Louis also admitted that she understood that she had to comply with the Board's operational rules and regulations and carry out the Clinic's policies. Dr. Louis testified that she was responsible for diagnosis and treatment but stated that she was subject to the general rules governing the rendering of medical care established by the Board.

Ann Buess, the comptroller for the Clinic, testified that the Clinic paid for all the overhead and expenses associated with Dr. Louis' practice in 1992. Buess further testified that certain expense adjustments were made to Dr. Louis' net production in January 1994. Buess stated that the net production calculation formula was changed between 1996 and 1998. During her deposition, Buess stated that the compensation formula was "modified on a fairly frequent basis depending upon the dynamics of the physician marketplace to some extent." She stated that expenses included RNs, LPNs, and MAs, and, under the old formula, those assistants were paid out of the percentage of the physician's net production the Clinic retained. Buess testified that additional expenses were deducted from Dr. Louis' gross production to calculate her net production under the new formula.

The trial court determined that the Clinic breached paragraph 9 of the employment agreement and that the breach prevented specific performance. The court determined that the direct-help extenders, such as a physician assistant's RN or LPN, were now

being charged to the physician and this was a change from the previous formula of merely charging the physician for the assistant. The court determined that this change was inconsistent with paragraph 9 of the employment agreement and the Clinic's obligation to "furnish, cause to be furnished or to assume those related expenses with the doctor's practice."

Substantial competent evidence supports the trial court's finding that the Clinic breached paragraph 9 of the employment agreement. The Clinic failed to assume all expenses related to Dr. Louis' practice and, instead, charged Dr. Louis for her direct help and the direct-help extenders. Moreover, while the Board had discretion to modify the compensation formulas, there was no evidence that the modifications were in writing or signed, or that there were discussions among the shareholders about the modifications at issue. Therefore, the Clinic breached the employment agreement with the 2003 modification and all previous modifications which charged Dr. Louis for their direct-help extenders.

B. *Even if the Clinic breached the agreement, was Dr. Louis relieved from specific performance?*

The Clinic contends that, even if it breached the employment agreement, the breach was not a condition precedent to Dr. Louis' performance and, therefore, did not release Dr. Louis from her performance under the agreement. The Clinic asserts that Dr. Louis' acceptance of previous modifications of her salary constituted waiver. As a result, she was estopped from using the 2003 modification as a defense. The Clinic contends that Dr. Louis was aware when she signed the employment agreement that the Board could periodically change the compensation formula and asserts that she was aware of such changes and accepted the benefits. The Clinic asserts that Dr. Louis could not claim its breach excused her breach and that Dr. Louis is estopped from complaining about the 2003 compensation change.

The trial court has discretion to determine whether equity will decree specific performance of a contract. It depends on the facts and circumstances of the particular case. *Hochard v. Deiter*, 219 Kan. 738, 740, 549 P.2d 970 (1976). Judicial discretion is abused

if no reasonable person could take the view adopted by the trial court. *In re Marriage of Bradley*, 282 Kan. 1, 7, 137 P.3d 1030 (2006).

The Clinic contends that this case is similar to *Busch v. McGinnis*, No. 59,647, unpublished opinion filed June 12, 1987, because nothing in the agreement tied physician compensation to the liquidated damages provision as a condition precedent. Moreover, the Clinic asserts that the 2003 adjustment did not make it impossible for Dr. Louis to comply with the restrictive covenant. In *Busch*, the parties entered into a written partnership agreement. The plaintiff sued and sought enforcement of the liquidated damages provision after the defendant left. The defendant asserted that the plaintiff breached the agreement by withholding his rightful share of gross billings under the agreement and, therefore, could not enforce the liquidated damages provision. The court determined that the plaintiff's failure to pay the defendant constituted a breach but determined that the payment was not a condition precedent for enforcement of liquidated damages. Slip op. at 7. Moreover, the court determined that the defendant remained with the partnership for 9 months after the deductions began and that the plaintiff's failure to pay the defendant did not excuse the defendant from performing his contractual obligations. Slip op. at 7-8.

Furthermore, the Clinic contends that, if the 2003 compensation modification was a breach, then the multiple previous modifications between 1992 and 2003 were also breaches, which Dr. Louis accepted. The Clinic asserts that Dr. Louis' acceptance of the increased pay associated with the prior breaches constituted a waiver and equitably estopped Dr. Louis from using the 2003 modification as a defense.

Similarly, in *Pelishchek v. Voshell*, 181 Kan. 712, 717, 313 P.2d 1105 (1957), the plaintiff was estopped from claiming that the defendant had breached the contract, because the plaintiff had knowledge of the breach, but sought a new contract without complaining. The court held that the plaintiff waived his right to complain by keeping silent about the previous breach. 181 Kan. at 717-18. The Clinic also relies on *Brent Towing v. Scott Petroleum Co.*,

735 So. 2d 355, 359 (Miss. 1999) (quoting 17A Am. Jur. 2d, Contracts § 663, p. 669), which states that if a contracting party has knowledge of a breach but receives money in the performance of the contract, then the party waives the breach.

Furthermore, the Clinic contends that this case also is similar to *Axtell Clinic v. Cranston,* No. 56,745, unpublished opinion filed June 20, 1985. In that case, the plaintiff sought to enforce a non-competition clause against the defendant. The defendant argued that the covenant should not be enforced because it was against public policy and that the plaintiff previously acted unethically. This court upheld the finding that the defendant was aware of the breach but continued to accept the benefits of the breach without protesting. As a result, the court determined that the defendant was estopped from complaining about the plaintiff's conduct. Slip op. at 7.

Dr. Louis asserted that she complained when the Clinic began deducting her assistants' salaries from her collections because she now had to pay the salaries for her RN, her MA, and her physician assistant's LPN, even though the Clinic originally agreed to pay those expenses. Dr. Louis testified that she asked to have her employment agreement amended because she wanted to leave the Clinic. She attempted to shorten the 3-year period and lower the liquidated damages to 10%, but the Clinic rejected her proposal. Dr. Louis further testified that her salary decreased after the new plan was implemented.

In contrast, Cordon testified that Dr. Louis did not complain about the multiple changes in the salary formula from 1996 until February 1998. He further stated that the 1996 modification increased Dr. Louis' compensation. Cordon did not have knowledge of whether Dr. Louis complained to someone in the Clinic about the new salary formulas. Yet, Cordon had heard that Dr. Louis was unhappy in 2001 and 2003. Kenagy testified that Dr. Louis came to the Board with an offer to lower the liquidated damages clause to 1 year and 10% of net revenue.

The trial court held that Dr. Louis took advantage of the previous breaches when they increased her salary. The court further held that when her salary decreased, she wanted to declare a

breach and recoup her losses. Yet, the court further determined that Dr. Louis did not sustain her burden of proving actual damages. Furthermore, the court determined that Dr. Louis was estopped from asserting the Clinic's breach to recoup damages.

There is evidence that Dr. Louis had knowledge of the previous modifications, which would have constituted breaches of the employment agreement. Yet, Dr. Louis accepted those breaches and the salary increases. As a result, the trial court properly determined that Dr. Louis had accepted the prior breaches and was estopped from claiming a breach.

In addition, based on the cases previously cited, the breach by the Clinic did not relieve Dr. Louis of her performance under the restrictive covenant of the employment agreement or preclude the Clinic from seeking specific performance.

Reversed and remanded with directions.