No. 123,628

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DOAN FAMILY CORPORATION d/b/a/ H&R BLOCK,
*Appellant*,

v.

SHELLY ARNBERGER,
*Appellee*.

SYLLABUS BY THE COURT

1.

Noncompete agreements in employment contracts are valid and enforceable if the restraint on competition is reasonable under the circumstances and not adverse to the public interest.

2.

Courts evaluating the time and geographic restraints in a noncompete clause in an employment contract must determine whether those limitations are objectively reasonable under the totality of the circumstances.

3.

Kansas appellate courts exercise unlimited review when determining whether a noncompete clause in an employment contract is enforceable as written. The question whether a noncompete clause is legally appropriate—whether an employer has a legitimate business interest and whether the clause otherwise harms the public welfare— is a question of law subject to unlimited review. Likewise, the district court's determination whether the time and geographic restraints are objectively reasonable under the totality of the circumstances is subject to unlimited appellate review.

4.

If a district court has properly found that the time and geographic restraints in a noncompete clause are unenforceable under the totality of the circumstances, the district court's equitable discretion to reform the contract and modify the restraints is reviewed for an abuse of discretion.

5.

A party requesting attorney fees on appeal must provide enough detail to allow appellate courts to meaningfully evaluate the reasonableness of the representation provided. When a party fails to provide enough information to allow courts to conduct this assessment, courts have discretion to independently determine an appropriate fee or to deny the request for fees altogether.

Appeal from Barton District Court; MIKE KEELEY, judge. Opinion filed December 30, 2022. Reversed and remanded with directions.

*John D. Beverlin II*, of Stull, Beverlin, Nicolay & Haas, LLC, of Pratt, for appellant.

*Thomas J. Berscheidt*, of Berscheidt Law Office, of Great Bend, for appellee.

Before MALONE, P.J., ATCHESON and WARNER, JJ.

WARNER, J.: The Doan Family Corporation appeals the district court's judgment against Shelly Arnberger, Doan's former employee, after Arnberger violated the restrictive covenants in her employment contract. Doan argues that the district court improperly reduced the duration of the contract's noncompete clause from two years to one year, resulting in a significantly reduced damages award. Doan also challenges various other aspects of the district court's decision relating to its measure of damages, costs, and attorney fees. After carefully reviewing the record and the parties' arguments,

2

we agree that the district court erred when it reduced the duration of the noncompete clause. We therefore reverse the district court's decision and remand the case so the court may calculate Doan's damages using the two-year term in the employment contract.

FACTUAL AND PROCEDURAL BACKGROUND

Doan owns H&R Block franchises in Great Bend and Pratt. Under Doan's business model, employees conduct in-person client interviews to prepare and file tax returns and offer other products. Clients generally work with a specific employee, and employees call their clients at the beginning of each tax season to solicit their business. These practices help foster client relationships, resulting in clients returning to the franchise in future tax years.

Arnberger and Juanita Reimer were employed as tax preparers at Doan's Great Bend location. Arnberger had worked at Doan for 16 years—preparing taxes at the company every tax year from 2001 until 2016. At the beginning of each tax season, Arnberger would enter into an annual employment agreement with Doan. The issues in this case concern two provisions in the 2016 employment contract: the post-employment noncompetition clause (which we refer to as "the noncompete clause") and the remedies clause:

- The noncompete clause prohibits former employees from providing tax-return preparation or filing services for or soliciting company clients—persons for whom the former employee provided these services during their employment—for two years after their employment with Doan ends. The clause states that this two-year term will be tolled when the former employee is in violation of the noncompete clause and during litigation necessary to enforce the clause.

3

- Under the remedies clause, Doan is entitled to damages for a violation of the noncompete clause, and former employees must pay "all court costs, reasonable attorneys' fees, and expenses incurred" in enforcing the clause.

Arnberger and Reimer left Doan in 2016. Beginning in the 2017 tax season, they began preparing and filing tax returns at their own business. A significant portion of the returns they filed that year—at least 70% of the returns filed by Arnberger—were for Doan's former company clients.

In March 2017, Doan sought to enforce the noncompete clause against Arnberger and Reimer to prevent the continued violation of the agreement and seek damages for their breach. The district court granted a temporary injunction after the 2017 tax season but lifted it at the beginning of the 2018 season, allowing Arnberger and Reimer to prepare and file returns, as any breaches of the agreement could be addressed through a damages award. Doan later resolved its claim against Reimer outside of court, so we limit our discussion here to Arnberger.

In June 2018, Doan filed a motion for summary judgment, arguing that Arnberger violated the noncompete clause. The district court granted the motion in part:

- The court accepted as uncontroverted all the facts listed in Doan's motion and found that Arnberger had violated the agreement.

- The court found that the noncompete clause was the result of a freely negotiated contract.

- The court concluded that the clause protected a legitimate business interest, was not harmful to the public welfare, and was not unduly burdensome for the employees.

4

- The court found that any geographical limitations imposed by the clause were "minimal, if any."

Despite these conclusions, the court found that the duration of the noncompete clause—two years—was unreasonable. In reaching this conclusion, the court did not specifically analyze the two-year restriction. Instead, it discussed restrictive covenants generally, noting that some people go to a certain tax preparer, regardless of the employer, because they are the preparer's family or friends. The court observed that Great Bend is "a rural community where people have contact with others because of who they are and not necessarily who they work for."

The court thus ruled that the noncompete clause was enforceable in a general sense. But the court modified the duration of that clause from two years to one year "to begin immediately . . . for one year from the date [of] this decision" (which was filed October 19, 2018). The court did not otherwise discuss the noncompete clause's tolling provision.

In August 2020, the court held a bench trial on the damages caused by Arnberger's violation of the noncompete clause. Jennifer and Eric Doan—who own and operate the company—both testified at trial and explained it generally takes two years to secure a long-term client; employees build client relationships the first year and encourage clients to return during the second year. The Doans also noted that for each prepared tax return, Doan earns 40% of the income, the employee earns a 30% commission, and the remaining 30% goes to H&R Block as a franchise fee. That franchise fee would apply to Doan's recovery. Basing its damages calculation on a three-year average, Doan sought past and future damages equal to the 70% of the income it would have earned had Arnberger not violated the noncompete clause. Following trial, Doan filed a motion requesting nearly $69,000 in attorney fees and approximately $3,500 in litigation expenses.

The district court found that Doan had suffered approximately $12,000 in actual damages. It reached this figure by limiting Doan's damages to the 2017 tax season—as it had modified the noncompete clause's duration to one year. In doing so, the court implicitly revised its previous summary-judgment ruling that the one-year time frame started from the date of that ruling and rejected Doan's arguments regarding the agreement's tolling provision. The court also limited Doan's recovery to 40% of the gross income, finding that it was not entitled to recover either the 30% franchise fee or the 30% commission. And the court awarded Doan $7,500 in attorney fees and about $1,400 in additional costs.

Doan appeals, challenging several aspects of the district court's judgment. Arnberger has not filed a cross-appeal.

DISCUSSION

The freedom to contract "is not to be interfered with lightly." *Foltz v. Struxness*, 168 Kan. 714, 721-22, 215 P.2d 133 (1950). People have "wide discretion" to determine the terms of their agreements, including in employment contracts. *Weinzirl v. Wells Group, Inc.*, 234 Kan. 1016, 1019, 677 P.2d 1004 (1984). Courts have a corresponding duty to honor and enforce employment contracts as they are written, as long as they are "not contrary to the law or unreasonable in [their] terms." 234 Kan. at 1019; *Wichita Clinic, P.A. v. Louis*, 39 Kan. App. 2d 848, 852, 185 P.3d 946 (2008). Accord *Liggatt v. Employers Mut. Cas. Co.*, 273 Kan. 915, 923, 46 P.3d 1120 (2002) (When contract terms are unambiguous, "'the court may not make another contract for the parties'" but rather must "'enforce the contract as made.'").

More than 70 years ago, the Kansas Supreme Court clarified that this same "paramount public policy" extends to restrictive covenants in employment contracts.

6

*Foltz*, 168 Kan. at 721-22. Recognizing the discrepancy of bargaining power between employers and employees, courts strictly construe ambiguous contract terms limiting the scope of an employee's postemployment conduct against the employer. See *Idbeis v. Wichita Surgical Specialists, P.A.*, 279 Kan. 755, 762, 112 P.3d 81 (2005). But like other contracts, unambiguous restrictive covenants must be enforced as written if they are legal and reasonable. See *Wichita Clinic*, 39 Kan. App. 2d at 852. Put another way, noncompete agreements are "valid and enforceable if the restraint on competition is reasonable under the circumstances and not adverse to the public welfare." *Weber v. Tillman*, 259 Kan. 457, Syl. ¶ 2, 913 P.2d 84 (1996).

Doan's primary argument on appeal is that the district court erred when it reduced the term of the noncompete clause in Arnberger's employment contract to one year because the clause as written was reasonable and enforceable under Kansas law. We partially agree and find that the two-year term of the original agreement was reasonable. But we find no error in the district court's decision not to enforce the clause's tolling provision. We remand the case to the district court to reconsider its damages award and corresponding attorney-fees and expenses rulings in light of these principles.

1. *The district court erred by reducing the duration of the noncompete clause to one year.*

As we have indicated, Kansas courts have a duty to enforce noncompetition covenants when those agreements are reasonable and do not harm the public. Kansas courts evaluate these principles by considering four overlapping questions:

- "Does the covenant protect a legitimate business interest of the employer?"
- "Does the covenant create an undue burden on the employee?"
- "Is the covenant injurious to the public welfare?"
- "Are the time and territorial limitations contained in the covenant reasonable?" *Weber*, 259 Kan. 755, Syl. ¶ 5.

7

The district court correctly identified these questions as the starting point for its analysis. The court found that the first three considerations weighed in favor of enforcing the noncompete clause in Arnberger's employment contract. It concluded that Doan's motivations—preserving customer contacts and its referral sources—were legitimate business interests under Kansas law. The court further found that though the noncompete clause did place restrictions on Arnberger, those restrictions were not unduly burdensome. And the court concluded that the noncompete clause did not contravene the public interest by preventing previous customers from seeking help from Arnberger instead of Doan or some other tax professional in the community. Neither Arnberger nor Doan contests these conclusions on appeal.

The court then turned to the noncompete clause's reasonableness. The court observed that the contract's geographical restrictions were "minimal, if any." The contract did not prevent Arnberger from offering tax preparation services around Great Bend; she could offer those services "for anybody, anywhere," as long as they were not for Doan's customers. The court found, however, that certain parts of the restrictions—a two-year prohibition on assisting and soliciting Doan's customers and the restriction as to all of Doan's clients—were unreasonable. It explained:

> "The Court has concerns this should be for a period of two years and as to all of the clientele the plaintiff is trying to prevent from going to the defendants. It is clear some people go to a tax preparer or an accountant because they are family or friends. In other words, the plaintiff received a benefit when the two defendants started working for the plaintiff in that they brought clients with them, such as family members or family businesses, because those people were comfortable with the defendants and not because they were going to the plaintiff.
>
> "The Court has concerns with the fact it should not interfere with an agreed-upon contract but is also punishing people who want to go to a particular tax preparer or accountant rather than an accounting firm. In this case, someone may want to go to one of the defendants rather than to the plaintiff."

8

The court found the noncompete clause's two-year restriction was "excessive under these facts and circumstances." The court thus invoked its equitable powers and modified the agreement to restrict Arnberger's actions for one year, instead of two. The court also indicated that the clause did not apply to any of Arnberger's family members or family businesses. In its initial summary-judgment ruling, the court indicated that the one-year time limitation would begin from the date of its October 2018 ruling. The court revisited this decision after the damages trial, however, and limited Doan's damages to those suffered in the 2017 tax season.

Doan argues that the district court erred when it reformed the term of the noncompete clause from two years to one year and when it declined to enforce the clause's tolling provision that extended these restrictions for as long as a person breached the agreement. We agree with the first of these claims, but not the second.

We begin our analysis by considering what deference—if any—we give to the district court's evaluation of whether the noncompete clause was reasonable. Appellate courts have long recognized that the "ultimate question whether a restrictive covenant is contrary to public policy" is a legal question subject to unlimited appellate review, while the district court's underlying factual findings (which are not materially disputed here) are reviewed for substantial competent evidence. *Weber*, 259 Kan. at 462. Under this framework, broader questions as to whether a clause is contrary to the public interest— such as whether it seeks to protect legitimate business pursuits—are reviewed de novo. *Idbeis*, 279 Kan. at 766. In the event a clause harms the public interest, courts have broad discretion to determine the appropriate course of action, by either modifying the agreement or declining to enforce the restriction. See *Foltz*, 168 Kan. at 719-21 (affirming district court's discretion to modify territorial restriction in a noncompetition covenant).

9

What is less clear, however, is the proper standard to govern our review of the district court's reasonableness determination. While Kansas courts have on several occasions engaged in such a review, we have not clearly articulated the nature of our appellate inquiry and the deference we afford to the district court's reasonableness assessment—that is, whether there is a reasonable fit between the temporal and geographic limitations imposed and the employer's protectable interests.

While this standard has not been specifically articulated in our caselaw, a review of Kansas decisions reveals that the reasonableness inquiry in this context is an objective one, reviewed without deference to the district court's assessment. See *Graham v. Cirocco*, 31 Kan. App. 2d 563, 570-71, 69 P.3d 194 (considering reasonableness of temporal and geographic restrictions without deference to the district court), *rev. denied* 276 Kan. 968 (2003). Kansas appellate decisions reviewing the reasonableness of noncompetition covenants' temporal and geographic restrictions make little, if any, reference to the district courts' assessments of those provisions. See, e.g., *Weber*, 259 Kan. at 468-69 (assessing the time and geographical restrictions in a noncompetition clause without reference to the district court's analysis); *Wichita Clinic*, 39 Kan. App. 2d at 859-60 (independently determining that a three-year restriction was reasonable without deference to the district court's contrary finding); *Caring Hearts Personal Home Services, Inc. v. Hobley*, 35 Kan. App. 2d 345, 355, 130 P.3d 1215 (2006) (determining two-year timeframe was "clearly within the accepted range for the duration of post-employment restraints" without reference to the district court's decision). Instead, we have independently reviewed the facts and the parties' arguments to determine whether the restraints imposed are reasonable.

This unlimited review makes practical sense. When appellate courts assess the enforceability of a restrictive covenant, our analyses of the *Weber* questions often overlap. The reasonableness of a time or territory restriction can depend on the employer's legitimate business interest, which is subject to de novo review. See *Idbeis*,

10

279 Kan. at 766; *Weber*, 259 Kan. at 466. Likewise, we have recognized that an overly expansive geographic restriction can harm the public interest by restricting access to important services. See *Graham*, 31 Kan. App. 2d at 571. Because courts' reasonableness inquiry is intertwined with these legal questions, it follows that an analysis of each consideration should be conducted without deference to the district court's assessment.

This objective reasonableness standard also tracks with the decisions of many other jurisdictions that have considered the question. See *Hassler v. Circle C Resources*, 505 P.3d 169, 173 (Wyo. 2022) ("'The reasonableness, in a given fact situation, of the limitations placed on a former employee by a covenant not to compete are determinations made by the court as a matter of law.'"); *Central Indiana Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 729 (Ind. 2008) ("Unlike reasonableness in many other contexts, the reasonableness of a noncompetition agreement is a question of law."); *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 78, 866 N.E.2d 85 (2006) ("Courts, when assessing the reasonableness of restrictive covenants, are to apply an objective standard."); *Henshaw v. Kroenecke*, 656 S.W.2d 416, 418 (Tex. 1983) ("The question of whether a covenant not to compete is reasonable is a legal question for the court.").

In sum, Kansas appellate courts exercise unlimited review when determining whether a noncompete clause in an employment contract is enforceable as written. The question whether a noncompete clause is legally appropriate—whether an employer has a legitimate business interest and whether the clause otherwise harms the public welfare— is a question of law subject to unlimited review. *Idbeis*, 279 Kan. at 766. Likewise, the district court's determination whether the time and geographic restraints are objectively reasonable under the totality of the circumstances is subject to unlimited appellate review. *Weber*, 259 Kan. at 468-69 (assessing time and geographic restraints in a noncompete agreement without reference to the district court's analysis). If the district court has properly found that the time and geographic restraints in a noncompete clause are unenforceable under the totality of the circumstances, however, the district court's

11

equitable discretion to reform the contract and modify the restraints is reviewed for an abuse of discretion. *Eastern Distributing Co. v. Flynn*, 222 Kan. 666, 676, 567 P.2d 1371 (1977); *Foltz*, 168 Kan. 714, Syl. ¶ 8.

Having concluded that our review over the district court's determination whether the time and geographic restraints are reasonable is unlimited, we must determine whether temporal limitations on Arnberger's actions—the two-year restriction and the tolling provision—were reasonable under the facts of this case.

Turning first to the two-year restraint, Kansas courts have upheld such restrictions on several occasions. See, e.g., *Graham*, 31 Kan. App. 2d 563, Syl. ¶ 7 ("A 2-year time period is common in Kansas noncompetition clause cases."). While a two-year limitation might not always pass muster, the facts illustrate the reasonableness of that limitation here.

Doan's owners testified that maintaining relationships with the company's clients is the most important part of its business. The two-year time restriction directly serves that interest because it takes time to build a client relationship; the first year initiates the relationship with the company, and the second year solidifies the relationship. When an employee leaves, Doan hopes to allow the employee's clients to develop a relationship with another employee. To do so, the client must work with a new tax preparer the first year, get to know them, and, if satisfied, return the following year to work with that same preparer. The facts emphasized by the dissent—that the tax-preparation season is focused on the timeframe from January through April and that tax preparers signed new employment contracts each year—do not, in our view, diminish Doan's reasons for the two-year restraint. Indeed, the noncompete clause did not prevent Arnberger from offering tax preparation services during that two-year period; she just could not provide those services to or otherwise solicit Doan's clients. The two-year period merely allowed

Doan to continue to foster those existing client relationships by connecting their customers with a new tax preparer at the company.

Given these facts, the two-year time restriction in Arnberger's noncompete clause was objectively reasonable, and the district court erred in holding otherwise. The district court's explanation that Great Bend is "a rural community where people have contact with each other because of who they are and not necessarily who they work for" is not supported by evidence in the record. We question the evidentiary basis for the court's finding, as it was made based only on reviewing the parties' summary-judgment filings before conducting any evidentiary hearing. But more importantly for purposes of our review, this finding does not reasonably support the district court's decision to reduce the duration of the noncompete clause from two years to one year.

The district court did not err, however, when it declined to enforce the noncompete clause's tolling provision. That provision extends the clause's time restrictions whenever a person breaches the agreement. Practically speaking, the tolling provision could result in an unlimited restriction on a person's postemployment activities, making them liable to their former employer for lost profits in perpetuity. Doan did not offer any explanation for this provision at trial, except by arguing that it should both receive damages for Arnberger's breach and the ability to prevent her from preparing others' taxes for some extended two-year period. We do not find this punitive explanation persuasive. While a two-year period is a reasonable restriction under these facts, an indefinite extension of that period is not a reasonable restraint on Arnberger.

After reviewing the facts of this case, we find that the district court erred when it reformed the duration of the parties' noncompete clause from two years to one year. Because the two-year term was reasonable, the court did not have the discretion to rewrite that term of the agreement. See *Wichita Clinic*, 39 Kan. App. 2d at 859-60 (district court erred in reducing duration of restrictive covenant from three years to two

13

years when three-year term was reasonable); see also *Liggatt*, 273 Kan. at 923 (When a contract is unambiguous, "'the court may not make another contract for the parties. Its function is to enforce the contract as made.'"). The district court did not err when it declined to enforce the contract's tolling provisions.

As we have indicated, the district court based its damages calculation at trial on its erroneous decision to modify the duration of the noncompete clause to one year. This calculation, like the modification on which it relied, was rooted in an error of law. We therefore reverse the district court's damages award and remand with directions that the court determine the damages that Doan suffered as a result of Arnberger's actions during the 2017 and 2018 tax seasons and enter judgment for that amount. Neither party has pointed to any evidentiary matter or factual dispute that would require a new trial in this case. Thus, we presume that this determination can be made, with the assistance of briefing by the parties, on the existing trial record.

2. *We address additional questions that will arise on remand.*

Doan's brief raises a few other questions regarding the district court's rulings. Because we are remanding the case for a new damages assessment, we need not address each allegation. But there are three matters that require further discussion and direction: (1) the responsibility for the 30% franchise fee and the application of the solicitation clause, (2) Doan's request for attorney fees, and (3) Doan's contractual claim for expenses.

Doan's first argument challenges two of the district court's findings—that the 30% franchise fee was not a recoverable damages element and that Arnberger did not solicit Doan's customers. Doan asserts that the district court erred when it calculated its damages award based only on the net amount it would have received as income after paying its 30% franchise fee to H&R Block. Doan points out that its owners testified that the

14

company must pay a franchise fee on all income the company receives, including the damages award collected from Arnberger. The district court apparently did not find this testimony, which was not supported by any franchise documentation, credible—an assessment we cannot second-guess on appeal. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 407, 266 P.3d 516 (2011). And excluding the franchise fee from the damage award aligns with the basic principle that damages are designed to restore an injured person to the position that they would be in without the breach, not to grant the party a windfall profit. *Evenson v. Lilley*, 295 Kan. 43, Syl. ¶ 5, 282 P.3d 610 (2012); *Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 527, 113 P.3d 241 (2005). Given this evidentiary record, Doan has not shown any error in the district court's decision to exclude the franchise fee and merely repay Doan for its lost income.

The parties similarly presented conflicting evidence as to whether Arnberger had been soliciting Doan's former customers. The district court apparently found the evidence weighing against solicitation to be more persuasive. It is not the role of this court to reweigh disputed trial evidence. *Wolfe Electric*, 293 Kan. at 407.

Turning to Doan's contractual claims regarding the district court's award of attorney fees and expenses, we agree with Doan—and with the district court—that both were available under Arnberger's employment contract. At the hearing on attorney fees in September 2020, Doan's attorney, John Beverlin, testified that his hourly rate in this case was $175 per hour, which was consistent with the other attorneys in Pratt, where his firm was located. He testified that he had been working on the case since Doan contacted his firm in March 2017. Since August 2020, Beverlin had spent 358.85 hours on the case. Based on these numbers, as well as various other considerations, Doan sought $69,000 in attorney fees. Beverlin also testified that Doan had about $3,400 in expenses for litigation, filing fees, service fees, witness fees, postage, mileage, mediation fees, deposition fees, transcript fees, and copying.

15

The district court found the amounts of these requests were excessive and unreasonable. It ultimately awarded Doan $7,500 in attorney fees and about $1,400 in various expenses—$405.60 for court costs, $90 for costs associated with process service, $173.28 for shipping and postage, $153.93 for witness fees, and $609 in copy charges. The court denied Doan's request for additional costs and expenses.

In deciding the reasonableness of attorney fees, courts consider the eight factors set forth in Rule 1.5(a) (2022 Kan. S. Ct. R. at 333) of the Kansas Rules of Professional Conduct (KRPC). See *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 169, 298 P.3d 1120 (2013). The district court is an expert in the area of attorney fees and can draw on its own knowledge and expertise in determining the value of services rendered. Although an appellate court is also an expert on the reasonableness of attorney fees, we do not substitute our judgment for that of the district court on the amount of the attorney fees awarded unless the facts of the case warrant revisiting the district court's ruling. *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, 940, 135 P.3d 1127 (2006); *State ex rel. Schmidt v. Nye*, 56 Kan. App. 2d 883, 896, 440 P.3d 585 (2019).

Here, the district court reviewed the factors under Rule 1.5(a):

> "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent." KRPC 1.5(a) (2022 Kan. S. Ct. R. at 333).

16

The court then discussed several of these factors in explaining its original attorney-fees decision. The court noted that Doan aggressively pursued its case against Arnberger, though it maintained both Arnberger and Reimer were at fault for soliciting clients and agreed to settle Reimer's case for a relatively small amount. The court noted that Doan spent considerable time pursuing future damages, which it ruled were not permitted under the terms of the employment contract. And the court found Arnberger had presented legitimate defenses in litigating the case and awarded the amount of attorney fees it deemed reasonable given the circumstances of the case. Because much of the district court's analysis focused on the extent of Doan's recovery and success, we agree with Doan that we should vacate the court's award and remand the case for reconsideration in light of our conclusion that the noncompete clause should have been enforced—and damages awarded—for two years, not one year.

As a final claim of error, Doan argues the district court misinterpreted the agreement when it denied reimbursement of litigation expenses because the agreement intended the expenses, like deposition and transcript fees, to be assessed as costs. Doan also argues that the agreement included the mileage for counsel's travel time and expenses for mediation. Insofar as this issue requires interpretation of the remedies clause of the agreement, our review is unlimited. See *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016).

The remedies clause states that a former employee who breaches the agreement will be responsible to pay damages associated with the breach, as well as attorney fees and expenses incurred during the enforcement of the contract. That clause states in relevant part:

> "In addition to injunctive relief, Associate acknowledges that the Company is entitled to damages for any breach of [the noncompete clause]. Further, in the event of such breach

or violation, Associate shall pay the Company all court costs, reasonable attorneys' fees, and expenses incurred by the Company in enforcing this Agreement."

As this language indicates, the parties' employment contract contemplated payment by the breaching employee of court costs, reasonable attorney fees, *and* expenses. The district court declined to grant Doan's requests for deposition expenses, mileage, and mediation expenses, observing that these items were not typically allowable as court costs. But contracting parties are not limited in their agreements to allocating expenses to what the court could award as costs. And Kansas courts have routinely differentiated between court costs, which are available to all prevailing parties under K.S.A. 60-2003, and attorney fees and expenses, which parties may contractually agree to provide. See *Condemnation of Land by City of Mission, Kan. v. Bennett*, 7 Kan. App. 2d 621, 622-24, 649 P.2d 406 (1982). Here, the governing question was not whether the expenses requested were allowable as court costs, but whether the expenses were "reasonable" and "incurred by [Doan] in enforcing" Arnberger's employment contract. Like the measure of damages and reevaluation of Doan's attorney fees, the district court on remand must evaluate and award reasonable expenses Doan incurred in enforcing its rights under the employment contract's noncompete clause.

3. *We deny Doan's request for appellate attorney fees.*

Following oral argument in this case, Doan asked this court to order Arnberger to pay $17,447.50 in appellate attorney fees and $329.89 in appellate costs. We deny the motion for fees because Doan's request fails to include the level of detail necessary to determine the reasonableness of that request. We partially grant Doan's request for costs in accordance with Supreme Court Rule 7.07(a)(5) (2022 Kan. S. Ct. R. at 52).

An appellate court may apportion appellate fees and expenses as justice requires and award attorney fees if the district court could do so. Supreme Court Rule 7.07(a)(4), (b)(1) (2022 Kan. S. Ct. R. at 51). The parties do not dispute that this court has the

18

contractual authority to award Doan's appellate attorney fees and expenses under Arnberger's employment agreement. But the fact that this court *may* award fees in some instances does not mean that Doan's fee request is reasonable or meets the requirements of Kansas law.

When a party requests attorney fees on appeal, courts are charged with determining whether the fees sought are "reasonable." See *Johnson*, 281 Kan. at 940-41. A party requesting attorney fees must file a motion and attach an affidavit explaining the nature and extent of the services, as well as the time spent on the appeal, and applying the eight factors contained in KRPC 1.5. Supreme Court Rule 7.07(b)(2) (2022 Kan. S. Ct. R. at 51). Appellate courts are considered experts in the realm of appellate attorney fees and have broad discretion to assess the reasonableness of the fees requested. See *Johnson*, 281 Kan. at 940.

The reasonableness of hourly attorney fees generally starts with a two-part inquiry—assessing both the reasonableness of the attorney's hourly rate and the reasonableness of the time spent representing the client's interests. See *Hatfield v. Wal-Mart Stores, Inc.*, 14 Kan. App. 2d 193, 199, 786 P.3d 618 (1990) (calculating attorney fees in a workers compensation case by multiplying reasonable hours spent by reasonable hourly rate); see also KRPC 1.5(a)(1), (a)(3) (2022 Kan. S. Ct. R. at 333) (reasonable fees include consideration of the "fee customarily charged in the locality for similar legal services" and "the time and labor required" by the representation). Courts have traditionally described this inquiry as a "lodestar calculation." See *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 47 Kan. App. 2d 1112, 1125-27, 284 P.3d 348 (2012) (discussing and applying the lodestar method). Once a court has calculated the lodestar, the fee may be adjusted based on the other considerations in KRPC 1.5(a) to determine a reasonable attorney-fee award.

19

In an effort to satisfy this lodestar inquiry, Doan's motion for attorney fees attached an affidavit from its counsel. The attorney indicated that he charged Doan $175 per hour for his representation in this case, and no one disputes the reasonableness of this hourly rate. Instead, the shortcoming in Doan's request lies in the affidavit's lack of specificity about the time spent on the attorney's representation.

In his affidavit, Doan's counsel explains he spent nearly 100 hours preparing the appeal. The affidavit then provides broad categories of actions and provides a total number of hours spent performing that general type of work. For example, the affidavit states that Doan's attorney spent 11 hours "preparing and filing the documents required for the appeal and to docket the appeal." The affidavit also states the attorney spent 9.4 hours "reviewing the record on appeal" and 42 hours drafting Doan's brief. Though the affidavit sometimes provides more detail in its summaries of the categories, it does not provide any further breakdown of the hours spent for each discrete task.

Thus, instead of including a description of "the specific amount of time allocated to each individual task," the affidavit simply provides blocks of time for each general category of work. *Robinson v. City of Edmond*, 160 F.3d 1275, 1285 (10th Cir. 1998). Kansas courts have found that this type of block billing does not provide the level of specificity required in determining attorney-fee awards.

Courts discourage block billing for several reasons. The imprecision of block billing can "camouflage[] the nature of a lawyer's work and raise[] suspicions about whether all the work claimed was actually accomplished or was necessary." *Citizens' Utility Ratepayer Bd.*, 47 Kan. App. 2d at 1133. There is no reason for us to ascribe these motivations to Doan's counsel here. But on a more benign level, grouped or block billing makes it difficult—if not impossible—for a court to assess the reasonableness of the time an attorney spent representing his or her client.

20

Here lies the deficiency of Doan's motion and supporting affidavit. These documents do not provide the information necessary to meaningfully evaluate the reasonableness of the time spent throughout the appellate representation. In some instances, courts have attempted to fashion a reasonable fee without such documentation. See, e.g., 47 Kan. App. 2d at 1132 (discussing *Case v. Unified School Dist. No. 233, Johnson County*, 157 F.3d 1243, 1250 [10th Cir. 1998]). In this case, however, Doan provides no other documentation—no invoices, timesheets, or detailed summaries—on which we may base our assessment. The absence of this information is particularly glaring, as the affidavit indicates that Doan's attorney spent 5.7 hours preparing the motion for attorney fees, including "reviewing invoices from" the attorney's law firm.

As the party requesting attorney fees and expenses, Doan has the burden of providing a record on which this court may meaningfully assess its request. It has not done so in this case. We therefore deny Doan's request for appellate attorney fees and expenses.

Doan's request for costs incurred during the course of the appeal is governed by Supreme Court Rule 7.07(a)(5) (2022 Kan. S. Ct. R. at 52). Permissible costs, including recovery of the fee to docket the appeal, will be directed by the appellate mandate.

Reversed and remanded with directions.

\* \* \*

ATCHESON, J., dissenting: What this case ought to be about is the legal justification for a two-year noncompete provision in a contract of adhesion between the franchisee of a corporate juggernaut and an employee hired for about three months to provide the mostly rote preparation and filing of personal income tax forms for members of the public. That sort of overreach should be branded contrary to public policy as an

21

impermissible weight on the right of everyday workers to earn a living in their trade or field of endeavor and, therefore, should be unenforceable.

But given the issues presented to us, I can't reach that result. So I would settle for affirming the principal conclusion of the Barton County District Court in shortening the noncompete term to one year and awarding money damages for that period (rather than injunctive relief) to the Doan Family Corporation and against Shelly Arnberger, its former employee. The Doan Family Corporation claims to have been shortchanged in the district court and has appealed. Arnberger has not cross-appealed and, thus, is apparently legally content to live with that outcome. We couldn't give Arnberger more than she has asked for on appeal even if we were disposed to do so. As a result, the legal field on which we play is, in a word, confined.

To be sure, the district court didn't get it right, but it got closer than the majority does. Hence my dissent from the majority's central ruling remanding the case to the district court with directions to inflict further financial punishment on Arnberger.

I. DOAN FAMILY CORPORATION'S EFFORT TO STYMIE FAIR COMPETITION

*A. The Contract.* The Doan Family Corporation is a franchisee of H&R Block, a multinational corporation headquartered in Kansas City, Missouri. As a franchisee, the Doan Family Corporation owns and runs a tax preparation service under the H&R Block banner with offices in Great Bend and Pratt. Arnberger signed an employment contract with the Doan Family Corporation dated January 1, 2016, that had a term through April 15—basically for three-and-half months—to work as a tax preparer in Great Bend. In that job, Arnberger met with people in the Great Bend office and prepared their personal income tax forms and filed the forms with the appropriate government agencies. While Arnberger had some training in that sort of comparatively simple tax preparation, she was not a certified public accountant. Nor did she provide any sort of ongoing accounting or

tax service to the customers over the course of the year. As compensation, Arnberger received 30 percent of the fees the customers paid for the tax service she provided. The contract contained a noncompete provision that for two years barred Arnberger from preparing or filing income taxes for anyone she helped as a customer at the Great Bend office after January 1, 2015—a peculiar reach-back clause predating the term of the contract and expanding the scope of its prohibition. The provision also precluded Arnberger from inviting any of those customers to have her prepare their taxes were she to go to work elsewhere. If Arnberger violated the provision, the Doan Family Corporation could sue her for injunctive relief and money damages. The contract allowed the Doan Family Corporation to recover attorney fees and other litigation expenses if it successfully enforced the noncompete restriction; Arnberger had no comparable contractual right were she to prevail in a legal battle.

The contract was one of adhesion presented to Arnberger and her coworkers as a take-it-or-leave-it proposition. There was no negotiation. An adhesion contract is not inherently unenforceable for want of any true bargaining. See *Bank of America v. Narula*, 46 Kan. App. 2d 142, 163, 261 P.3d 898 (2011). But it should be suspect when it contains one-sided exchanges and distinctly unequal burdens and benefits. *Damico v. Lennar Carolinas, LLC*, 437 S.C. 596, 613-14, 879 S.E.2d 746 (2022); 17 C.J.S. Contracts § 25 (courts examine adhesion contracts "with special scrutiny").

The contract here largely appears to be the instrument of H&R Block—especially the noncompete provision and other restrictive conditions imposed on former employees. H & R Block is identified as an intended third-party beneficiary of those clauses with independent legal authority to enforce them. Moreover, the noncompete provision obviously has not been tailored by the Doan Family Corporation to meet its perceived needs as an enterprise with two outlets in small Kansas communities. Rather, the provision recites alternative restrictions that become effective when the contract has been formed in other states. For example, the noncompete period is set at one year for

contracts in Arizona and Puerto Rico, and there is no prohibition in contracts in North Dakota. The provision, then, stands out as a tool of H&R Block to stifle competition, mostly on a small scale by impeding individuals like Arnberger from going to work for competitors or setting up their own mom-and-pop operations during tax season. Apart from an ironic drowning of the entrepreneurial spirit that motivated Henry Bloch and Richard Bloch, the founders of H&R Block, the provision likely imposes a legally impermissible anticompetitive burden on ordinary workers.

The legal inquiry necessarily focuses on the terms of the contract itself. The noncompete provision imposes a two-year restriction based on barely three months of employment—a fairly gross temporal disproportionality. The prohibition covers the customers of Doan Family Corporation that the employee would have worked with on a single occasion in a single tax season. Any given customer may have come in the door because of the H&R Block name or advertising. But that would hardly seem to be a sufficiently compelling reason to preclude the tax preparer from doing the same limited work for the customer at some other place the next tax season or the tax season after that. The service is a notably limited one—the preparation and filing of personal income taxes for a given year. That's all the Doan Family Corporation hired Arnberger to do. As I have said, the service required neither highly specialized or developed skills to perform nor entailed a continuing professional relationship like a certified public accountant would have with business clients or individuals with sophisticated and recurrent tax considerations.

The Doan Family Corporation has tried to make a great deal out of Arnberger's employment at the Great Bend office for 16 tax seasons, and the majority mentions the tenure of her service several times. Arnberger did work for many customers, often year after year, as a result. But her past contact with some customers is irrelevant to the enforceability of the noncompete provision in the 2016 contract. The contract would apply equally to a first-time employee of the Doan Family Corporation, and any

24

protectable contractual interest it or H&R Block asserts should be so measured. That Arnberger may have cultivated personal relationships with some customers while she worked for the Doan Family Corporation under contracts for successive tax seasons doesn't translate into a protectable interest under the most recent three-month contract.

B. *The Public Interests at Stake.* In assessing the public interest to be weighed against the employer's need for a noncompete clause, the district court and the majority incorrectly diminish the scope of the public interest. They focus exclusively on how the noncompete prohibition here might limit the number of tax preparers in the Great Bend area or inhibit a close friend or relative of Arnberger from having her do their taxes. But that's only part of the public good sacrificed to noncompete agreements. The other—and likely the much more important aspect—is the broad public good in permitting individuals to freely work in their chosen trades or fields of endeavor.

There is no substantial public benefit in enforcing adhesion contracts inhibiting a worker like Arnberger from gainful employment in her chosen field. Those contractual restrictions should be viewed as contrary to the public interest precisely because they restrict employment choices of individuals in rank-and-file type jobs by chaining them to an employer through a noncompete clause. Other employers would be reticent to hire such a person for fear of being drawn into litigation. And workers, such as Arnberger, trying to go it alone would be beaten down by their former employers' litigation. The coercive threat is often redoubled, as it was here, through one-sided fee-shifting clauses requiring the former employee to pay his or her former employer's attorney fees with no reciprocal right to recover their own attorney fees.

Noncompete agreements may, nonetheless, be appropriate in certain narrow circumstances. For example, high-level corporate officers with knowledge of a company's proprietary business model and similar strategic information about product development and marketing legitimately might be benched for some interval when they

depart. Those sorts of executives regularly negotiate golden parachute provisions that amply cushion the financial impact of a noncompete obligation. Noncompete restrictions also may have a place in coordination with nondisclosure agreements for scientific, technological, and other expert employees directly involved in research and design.

Similarly, temporally and geographically limited noncompete agreements may be appropriate when a professional, such as a physician or an accountant, joins a comparatively small practice and immediately begins treating or working with existing patients or clients who have been cultivated and retained by the established members of the business. In those circumstances, the new professional provides sophisticated services, often imbued with a fiduciary character, to the existing clientele on a regular basis over an extended period. The business has a recognized and protectable interest in that patient or client base, especially given the highly skilled and distinctly personal nature of the services provided. See, e.g., *Weber v. Tillman*, 259 Kan. 457, 468-69, 913 P.2d 84 (1996).

The Kansas Supreme Court has extended noncompete protections to wholesalers employing sales representatives who develop close relationships with a cadre of retail buyers through repetitive business contacts over an extended time. The court recognized a wholesaler had a protectable interest in those retail customers and properly could limit one of its representatives from exploiting those lucrative relationships by jumping to a comparable and better paying position with a competing wholesaler. *Eastern Distributing Co. v. Flynn*, 222 Kan. 666, 674, 567 P.2d 1371 (1977). The court's detailed discussion of protectable interests in *Eastern Distributing* is both instructive and a counterpoint to why the Doan Family Corporation had no protectable interest based on the 2016 contract with Arnberger.

Drawing from a variety of sources, the court recognized that although "customer contacts" may support noncompete provisions in limited circumstances, the prohibitions

26

cannot be deployed to stifle "ordinary competition." *Eastern Distributing*, 222 Kan. at 671-73. The hallmarks of protectable customer contacts include: (1) frequent, regular contacts between the company's employee and the client with little other interaction between the company and the client; (2) contacts at the client's home or place of business; and (3) a service of the kind that tends to forge a close relationship between the employee and the client, so that the client effectively becomes "a personal asset" of the employee. 222 Kan. at 672. As I have outlined, the work Arnberger performed under the 2016 contract—the only extant agreement the Doan Family Corporation had with her—falls short. Arnberger performed a single, comparatively limited service for customers at the Doan Family Corporation office in Great Bend. The three-month contract entailed Arnberger doing tax preparation for individual customers sequentially with little or no continuing contact with any given customer. The court in *Eastern Distributing* highlighted an often-cited article from the Harvard Law Review for the proposition that "if contacts are infrequent and irregular there may be no sufficient risk to the employer to support any degree of restraint." 222 Kan. at 672 (citing Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 659 [1960]).

The facts in *Eastern Distributing* reinforce Doan Family Corporation's lack of a protectable interest. There, Terry A. Flynn worked for Eastern Distributing, a liquor wholesaler in northeast Kansas, about five years, regularly calling on and selling to retailers at their stores. As Eastern Distributing's near exclusive contact with the retailers, Flynn became the face and, indeed, the embodiment of his employer. When Flynn took a comparable job with a competing wholesaler, Eastern Distributing sued to enforce a noncompete provision in its employment contract with Flynn. The court affirmed the district court's conclusion Eastern Distributing had a legally protectable interest supporting the noncompete provision. The court also upheld the district court's decision to enforce the contractual one-year prohibition on Flynn working for a competing wholesaler as reasonable and to equitably reduce the geographical area in which the prohibition would apply. The close personal relationship Flynn developed with Eastern

27

Distributing's retail buyers through frequent contacts over five years involving repetitive business transactions stands in marked contrast to the limited contact and work Arnberger did for the Doan Family Corporation's customers.

*C. The Result on Appeal.* In making its case on appeal, the Doan Family Corporation has discussed what it purports to be the valid protectable interest justifying the noncompete provision in the 2016 employment contract with Arnberger. As I have explained, I find the company's arguments unpersuasive. But in the absence of a cross-appeal from Arnberger, the issue is not in front of us. So I would affirm the district court's decision reducing the prohibition to one year and awarding the Doan Family Corporation limited money damages in place of injunctive relief. That's the closest I can come to what I view as the correct result in this case. I, therefore, dissent from the majority's decision to remand to the district court to enforce the contractual two-year noncompete period, to reevaluate the damage award accordingly, and to reconsider the attorney fee award to the Doan Family Corporation for litigating in the district court in light of what will be its expanded (and wholly unjustified) success.

## II. OTHER CONSIDERATIONS AT PLAY IN THIS APPEAL

*A. Doan Family Corporation's Request for Attorney Fees on Appeal.* In buttoning up the case, I turn to several other matters. First, I agree with the decision to deny attorney fees to the Doan Family Corporation for this appeal for the reasons the majority has outlined. Whether we should enforce a one-sided clause permitting an award of attorney fees to a corporate party drafting an adhesion contract presented to an individual seeking a rank-and-file job is not before us. I offer no opinion on the question in the absence of a challenge from Arnberger.

*B. Analytical Framework for Evaluating Noncompete Provisions.* The majority concludes (with some hesitancy) that the Kansas appellate courts have adopted a three-

step analytical method for evaluating noncompete agreements, looking at: (1) whether there is a protected interest; (2) if so, whether the contractual restrictions are reasonable; and (3) if the restrictions are unreasonable, whether the district court has appropriately exercised its equitable authority in revising them. My colleagues correctly say that across the run of cases, the appellate courts have been fuzzy, at best, in outlining their legal analyses. In the absence of historical clarity, the majority interpolates the three steps and finds the first two are questions of law subject to unlimited review on appeal. The third, as an exercise of the district court's equitable authority, should be reviewed for an abuse of discretion.

The courts have consistently viewed the first step—the determination of some protectable interest—as a question of law. *Idbeis v. Wichita Surgical Specialists*, 279 Kan. 755, 766, 112 P.3d 81 (2005) (noting the parties agree on this point and citing case authority); *Weber*, 259 Kan. at 462; *Eastern Distributing*, 222 Kan. at 673-74. Because I would find no protectable interest, my take on whether the analytical model has two or three steps makes no difference in my resolution of this case. We, of course, review questions of law without deference to the district court's determination. *In re Estate of Oroke*, 310 Kan. 305, 310, 445 P.3d 742 (2019).

There is a fair argument the Kansas Supreme Court actually has deployed a bifurcated analysis that treats what the majority identifies as the second and third steps as a single consideration entrusted to the district court's discretion and reviewed for abuse. See *Eastern Distributing*, 222 Kan. at 676; *Foltz v. Struxness*, 168 Kan. 714, Syl. ¶ 8, 718-19, 215 P.2 133 (1950). In both *Eastern Distributing* and *Foltz*, the district court equitably reformed (and reduced) the contractual restrictions in the disputed noncompete provisions—decisions predicated on determinations those restrictions were inequitable or unreasonable. In each case, the Supreme Court affirmed the district court's ruling by applying an abuse of discretion standard and without cleaving the predicate, though implicit, finding of unreasonableness from the reformation for some independent analysis

29

or review. That looks like a two-step approach, although it may not have been explicitly delineated as such. So neither decision expressly sets out an analytical model establishing a two-step test. Both *Eastern Distributing* and *Foltz* are considered leading cases on noncompete agreements, and their approach should not be dismissed as simply the work of outliers.

As the majority points out, a number of Kansas appellate opinions seem to apply an inferential intermediate step assessing the reasonableness of the noncompete restrictions without deference to the district court's determination before considering revisions of those restrictions. Again, however, the analytical protocol has not been precisely outlined. Appellate courts in many other jurisdictions explicitly review reasonableness as a question of law. The majority has catalogued some of those opinions, and I don't repeat them here.

Ultimately, treating the reasonableness of the particular restrictions in a noncompete agreement as a question of law makes some sense. In general, whether a contract term is reasonable and, thus, enforceable presents a question of law. Cf. *Gonzales v. Associates Financial Service Co. of Kansas*, 266 Kan. 141, 158, 967 P.2d 312 (1998) (unconscionability of contract "traditionally" question of law for the court); see 17B C.J.S. Contracts § 1007 (reasonableness of contract presents question of law). So what the majority outlines probably reflects the better rule, although it may be a freshly articulated rule in Kansas and not merely a reiteration of the law as it clearly stands now.[*]

[*] More broadly, reasonableness really presents a mixed question of fact and law. The district court may be required to resolve conflicting testimony or other disputed evidence to establish the relevant facts. For example, an employer's sales manager might testify a certain geographical restriction corresponds to the company's market area, while the employee could counter with records showing the company does little or no business in some of the restricted territory. The district court's resolution of that conflict and the resulting finding of fact as to the market area would be reviewed on appeal for substantial

competent evidence with considerable deference to any credibility determinations. Given those findings, however, an appellate court would review the district court's ultimate determination of reasonableness without deference as a legal conclusion. See *Geer v. Eby*, 309 Kan. 182, 190-91, 432 P.3d 1001 (2019).

*C. A Better Mousetrap for the 21st Century.* This journey into the legal world surrounding noncompete agreements leads to a body of Kansas common law that might benefit from a reexamination for the 21st century. Noncompete agreements have proliferated in the past two decades. Some companies have injected noncompete agreements into a wide array of jobs where they promote neither a legitimate employer interest nor any discernible public good and serve only to unfairly curtail the mobility of lower echelon and often poorly compensated workers. See Starr, Prescott, and Bishara, 64 J. L. & Econ. 53, 60-61 (Feb. 2021); Letter to Joseph Simons, chair Federal Trade Commission, https://oag.ca.gov/system/files/attachments/press-docs/11%2015%2019%20Multistate%20FTC%20Non-Compete%20Letter%20FINAL.pdf (Nov. 15, 2019) (attorneys general for 18 states and District of Columbia urge Federal Trade Commission to adopt rules "to bring an end to the abusive use of non-compete clauses in employment contracts"); Washington State Office of the Attorney General Attorney, *General Bob Ferguson stops King County coffee shop's practice requiring baristas to sign unfair non-compete agreements*, https://www.atg.wa.gov/news/news-releases/attorney-general-bob-ferguson-stops-king-county-coffee-shop-s-practice-requiring (chain of coffee shops in Seattle area agrees to discontinue use of noncompete agreements with most employees, including baristas and other low-wage workers); U.S. Department of the Treasury, *Non-compete Contracts: Economic Effects and Policy Implications*, at 3 (March 2016), https://patentlyo.com/media/2016/05/UST20Non-competes20Report1.pdf ("The prevalence of [non-compete] agreements raises important questions about how they affect worker welfare, job mobility, business dynamics, and economic growth more generally."); Illinois Attorney General, *Madigan Announces Settlement with Jimmy John's for Imposing Unlawful Non-Compete Agreements* (Dec. 7, 2016),

https://illinoisattorneygeneral.gov/pressroom/2016_12/20161207.html (company agrees to discontinue "highly restrictive non-compete agreements" imposed on employees including "low-wage sandwich shop employees and delivery drivers"); Irwin, *When the Guy Making Your Sandwich Has a Noncompete Clause*, The New York Times (Oct. 14, 2014), https://www.nytimes.com/2014/10/15/upshot/when-the-guy-making-your-sandwich-has-a-noncompete-clause.html; Greenhouse, *Noncompete Clauses Increasingly Pop Up in Array of Jobs*, The New York Times (June 8, 2014), https://www.nytimes.com/2014/06/09/business/noncompete-clauses-increasingly-pop-up-in-array-of-jobs.html.

In short, noncompete agreements have become a tool employers frequently use to impair what should be permissible fluidity in the workforce, particularly among lower-wage employees in service businesses. They tend to dampen both upward mobility and wages in job markets—anticompetitive results that impermissibly restrain trade and impede frontline workers from earning a living—contrary to well-established public policy, and they do so without protecting any demonstrably legitimate business interests. As I have indicated, those comparatively narrow interests include proprietary marketing plans, product research and design, and some protection for an existing client or customer base when a new professional, such as a physician or accountant, or a sales agent joins a business and is expected to develop a close, ongoing relationship with some of those clients or customers. Earlier this year, the Wyoming Supreme Court ably laid out the substantial public policy reasons for especially exacting judicial examination of noncompete agreements and a concomitant requirement that an employer marshal a compelling justification for narrowly tailored restrictions on a carefully limited set of employees. *Hassler v. Circle C Resources*, 505 P.3d 169, 173-74 (Wyo. 2022).

In *Foltz*—the case often viewed as ushering in the modern legal era for noncompete agreements in Kansas— the court held such provisions generally should be enforced consistent with a public policy grounded in an ostensible "freedom to contract."

168 Kan. 714, Syl. ¶ 1 (touting "modern doctrine" governing contracts in restraint of trade); 168 Kan. at 721-22 (recognizing "the paramount public policy is that the freedom to contract is not to be interfered with lightly"). Even on the legal landscape 70 years ago, the *Foltz* decision doesn't seem especially modern, despite its own claim to be so, and looks more like a throwback to the doctrine of substantive economic due process typified in *Lochner v. New York*, 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905). There, a bare majority of the Court struck down a New York statute limiting bakers to working no more than 10 hours a day and 60 hours a week because the measure deprived *bakers* of a constitutional liberty interest to contract to labor longer, despite demonstrably adverse effects on their health and the lack of any real bargaining power to negotiate different terms and conditions. 198 U.S. at 53-54; see 198 U.S. at 68-71 (Harlan, J., dissenting). The *Lochner* notion of a liberty interest or some other unbridled right to contract has been rejected. *Ferguson v. Skrupa*, 372 U.S. 726, 729-30, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963); *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391-94, 57 S. Ct. 578, 81 L. Ed. 703 (1937).

A paramount common-law freedom to contract may not be the legal doppelganger of a substantive due process right to contract, but they are sufficiently kindred notions to suggest the rejection of a constitutional protection should similarly undermine a judicially created fortress for contracts whatever their terms and the circumstances of their making. There is little in the way of freedom in a distinctly one-sided contract of adhesion between an employer and middle or lower echelon employees. A potential employee would have the right to walk away—and not to contract at all. But the obvious ability to refuse a nonnegotiable contract seems like a pallid form of freedom in the workplace. See *West Coast Hotel Co.*, 300 U.S. at 393 ("The point that has been strongly stressed that adult employees should be deemed competent to make their own contracts was decisively met nearly forty years ago in *Holden v. Hardy*, [169 U.S. 366, 397, 18 S. Ct. 383, 42 L. Ed. 780 (1898)], where we pointed out the inequality in the footing of the parties."). Moreover, the right to contract must yield to or at least accommodate public policies

advancing the economic (as well as the physical) health of rank-and-file workers. See *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 42, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987) (contract unenforceable if inimical to public policy); *Oakley v. Domino's Pizza LLC*, 23 Wash. App. 218, 222-23, 235, 516 P.3d 1237 (2022) (court voids as contrary to public policy clause in employment contract requiring arbitration of wage and hour claims and precluding class action proceedings); *Hassler*, 505 P.3d at 174; cf. *Simpson v. Farmers Ins. Co.*, 225 Kan. 508, 508-09, 592 P.2d 445 (1979) (court refuses to enforce clause in motor vehicle insurance policy deemed contrary to public policy).

In contrast to *Foltz*, a more realistic (and modernistic) view would treat noncompete provisions, especially in adhesion contracts or those between employers and employees of plainly disparate bargaining power, as facially contrary to public policy and, thus, viewed with disfavor. The burden should be cast upon the employer to clearly justify restrictions inhibiting the employee's ability to work elsewhere for reasons apart from simply curtailing competition generally or depriving a person of his or her livelihood in a chosen field. Many courts have recognized noncompete restrictions to be disfavored under the common law and, therefore, require substantial reasons to enforce them, since they run counter to a public good in freely permitting workers to earn a living. See, e.g., *Coates v. Bastain Brothers, Inc.*, 276 Mich. App. 498, 507-08, 741 N.W.2d 539 (2007) ("noncompetition agreements are disfavored as restraints on commerce," and the party seeking enforcement must establish validity of restrictions); *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 370, 34 N.E.3d 357, 12 N.Y.S.3d 606 (2015) (noncompete covenants "strictly construed" based on "powerful considerations of public policy . . . against sanctioning the loss of a livelihood"); *Washburn v. Yadkin Valley Bank and Trust Co.*, 190 N.C. App. 315, 323, 660 S.E.2d 577 (2008) ("Covenants not to compete restrain trade and are scrutinized strictly."); *Murfreesboro Medical Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005) (as disfavored restraint of trade, covenants not to compete "construed strictly in favor of the employee"); *Hassler*, 505

P.3d at 173-74 (noncompete agreements contravene a "'public policy encourag[ing] employees to seek better jobs from other employers or to go into business for themselves'" and are presumptively invalid, so they will be rigidly reviewed and will require employer "'to prove . . . some special circumstances'" rendering restrictions "necessary") (quoting *Ridley v. Krout*, 63 Wyo. 252, 265, 268,180 P.2d 124 [1947]). My list is merely illustrative. In some states, legislatures have adopted statutes curtailing noncompete provisions in employment contracts. See, e.g., Colo. Rev. Stat. § 8-2-113 (subject to limited exceptions, "any covenant not to compete that restricts the right of any person to receive compensation for performance of labor for any employer is void"); La. Stat. Ann. § 23:921 (limiting time and geographical restrictions); Wis. Stat. § 103.465 (noncompete agreements enforceable only if "reasonably necessary").

Finally, courts can best foster sound public policy by refusing to enforce noncompete provisions they find impermissible rather than reforming them to satisfy some equitable notion of reasonableness or fairness and then enforcing that judicially created term. See *Hassler*, 505 P.3d at 178-79; *Harville v. Gunter*, 230 Ga. App. 198, 199, 495 S.E.2d 862 (1998) (appellate court declines to enforce or reform overbroad noncompete agreement). The refuse-to-enforce approach is often called the red-pencil rule, presumably because a court effectively strikes the offending noncompete provision from the employment agreement, figuratively (I suppose) using a red pencil. See Enger, *Offers You Can't Refuse: Post-hire Noncompete Agreement Insertions and Procedural Unconscionability Doctrine*, 2020 Wis. L. Rev. 769, 780-81 (2020); U.S. Department of the Treasury, *Non-compete Contracts: Economic Effects and Policy Implications*, at 14. Wisconsin has codified a red-pencil rule for employment covenants not to compete. Wis. Stat. § 103.465.

The Kansas Supreme Court, of course, has endorsed equitable revision of impermissibly restrictive noncompete provisions. *Eastern Distributing Co.*, 222 Kan. 666, Syl. ¶ 4. And the practice appears to be widely used across jurisdictions. See U.S.

Department of the Treasury, *Non-compete Contracts: Economic Effects and Policy Implications*, at 16.

But equitable revision promotes several deleterious outcomes. First, it encourages employers to draft especially draconian noncompete provisions because they can be confident a reviewing court will revise them, leaving ostensibly reasonable restrictions in their place. *Hassler*, 505 P.3d at 176-77; Garrison and Wendt, *The Evolving Law of Employee Noncompete Agreements: Recent Trends and an Alternative Policy Approach*, 45 Am. Bus. L.J. 107, 175-76 (Spring 2008). So an employer has little or nothing to lose by overreaching. Conversely, a red-pencil rule encourages an employer to assess what noncompete provisions may be realistically necessary to shield legitimate business interests and to impose no greater limitations, precisely because an overreach will leave the employer with nothing.

Second, former employees may abide by the noncompete restrictions simply because they appear in a written agreement without realizing they are impermissibly harsh and, thus, unenforceable at least in that form. Former employees may comply because they cannot afford the attorney fees and related costs litigation would impose— whether they sue the employer to be free of the restrictions or the employer sues them to enforce the restrictions (or some equitably revised form of them). Similarly, a prospective employer may be reluctant to hire someone subject to a noncompete agreement for fear of being embroiled in a costly court battle, even though the restrictions appear unreasonable. In those circumstances, either the former employee's ignorance or what has been called the *in terrorem* threat of litigation effectively allows the employer to get away with an illegal restraint of those employees. See *Hassler*, 505 P.3d at 176-77; Garrison and Wendt, 45 Am. Bus. L.J. at 177. A red-pencil rule would tend to rein in the use of those impermissibly harsh noncompete provisions in the first place.

More prosaically, the equitable reform approach to noncompete agreements hands employers an especially beneficial result inconsistent with customary rules governing contract enforcement. Kansas courts typically refuse to enforce contract provisions that are contrary to public policy. *Varney Business Services v. Pottroff*, 275 Kan. 20, Syl. ¶ 11, 59 P.3d 1003 (2002); *Simpson*, 225 Kan. at 508-09; cf. *GFTLenexa v. City of Lenexa*, 310 Kan. 976, 984, 453 P.3d 304 (2019) (competent adults may enter into contracts that are neither illegal nor contrary to public policy). Likewise, the courts generally decline to make agreements for contracting parties by rewriting vague or otherwise problematic terms to say something they plainly do not. *Quenzer v. Quenzer*, 225 Kan. 83, 85, 587 P.2d 880 (1978) (court may not rewrite contract or make new contract for parties under guise of construing their agreement); *Lauck Oil Co. v. Breitenbach*, 20 Kan. App. 2d 877, 879, 893 P.2d 286 (1995) (The court's "function is to enforce the contract as made" and "not [to] make another contract for the parties."). There is no obvious legal justification for carving out an exception to those rules for noncompete provisions.

III. END OF THE LINE

In conclusion, I doubt the Doan Family Corporation had a legally protectable interest under its contract employing Arnberger for a few months in early 2016 to provide routine tax preparation and filing services to its customers that would justify the noncompete bar precluding her from doing comparable work for any of those customers when she started her own business. The adhesion contract sought to prevent fair competition in derogation of public policies discouraging restraint of trade and barring unnecessary impediments to workers earning a living in their chosen fields of endeavor. I, therefore, respectfully dissent from the majority's decision to remand this action to the district court to further penalize Arnberger.